| | | |
|---|---|---|
| **KALYN MARIE POLOCHAK,** | ) | |
| **#510405,** | ) | |
| | ) | |
| **Petitioner,** | ) | **No. 2:20-cv-00049** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **STANLEY DICKERSON, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Petitioner Kalyn Marie Polochak, an inmate of Women's Therapeutic Residential Center in Henning, Tennessee, filed a pro se, in forma pauperis petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging her 2012 convictions for first-degree murder, conspiracy to commit first-degree murder, especially aggravated robbery, and theft. (Doc. No. 1). Petitioner was a juvenile at the time she committed these crimes.

Respondent filed an Answer to the petition in which he asks the Court to dismiss the petition with prejudice. (Doc. No. 21).

The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. *See* Christian v. Hoffner, No. 17-2105, 2018 WL 4489140, at *2 (6th Cir. May 8, 2018) ("A district court is not required to hold an evidentiary hearing if the record 'precludes habeas relief.'") (quoting Schriro v. Landrigan, 550 U.S. 465, 474 (2007))). The petition therefore will be denied, and this action will be dismissed.

I. <u>PROCEDURAL HISTORY</u>

On December 16, 2010, the State filed a delinquency petition in the Overton County Juvenile Court. (Doc. No 20-1 at 127)[1]. The juvenile court entered a detention order against Petitioner and later transferred the case to criminal court. (<u>Id.</u> at 130, 138-39). On September 25, 2012, the Overton County Grand Jury indicted Petitioner on one count of first-degree premeditated murder, one count of first-degree felony murder, one count of conspiracy to commit first-degree murder, one count of especially aggravated robbery, and one count of theft of property valued at $1,000 or more but less than $10,000. <u>State v. Polochak</u>, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *1 (Tenn. Crim. App. Jan. 16, 2015), <u>perm. appeal denied</u>, (Tenn. May 14, 2015).

Petitioner moved to suppress the statements she made to paramedics and police before trial. <u>Id.</u> at *21-25. The trial court denied the motion to suppress following a hearing. <u>Id.</u> at *25. At trial, the jury convicted Petitioner on all charges. <u>Id.</u> at *1. The trial court merged the first-degree murder convictions and sentenced Petitioner to life imprisonment for this conviction. <u>Id.</u> During the sentencing hearing, the trial court sentenced Petitioner to concurrent sentences of fifteen years for conspiracy to commit first-degree murder, fifteen years for especially aggravated robbery, and two years for theft, all of which the trial court ordered Petitioner to serve concurrently with her life sentence. <u>Id.</u>

Petitioner appealed, and the Tennessee Court of Criminal Appeals affirmed on January 16, 2015. <u>Id.</u> The Supreme Court of Tennessee denied Petitioner's application for discretionary review on May 14, 2015. <u>Id.</u> Petitioner did not seek a petition for writ of certiorari from the United States Supreme Court.

---

[1] Herein, when citing to the case docket, the Court includes the CM/ECF PageID number(s) as opposed to the document page number(s). For example, in this citation, the Court cites to CM/ECF PageID# 127 of Exhibit No. 1 to Docket No. 20.

Petitioner filed a petition for post-conviction relief on April 12, 2016. (Doc. No. 20-31 at 2592). Petitioner filed a pro se and two amended petitions through appointed counsel. (Id. at 2596-2603, 2625-43). After an evidentiary hearing, the post-conviction court denied relief. (Id. at 2644-47). Petitioner appealed, and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief on November 4, 2019. Polochak v. State, No. M2018-01524, CCA-R3-PC, 2019 WL 5692112, at *1 (Tenn. Crim. App. Nov. 4, 2019), perm. app. denied (Tenn. Mar. 26, 2020). The Supreme Court of Tennessee denied Petitioner's application for discretionary review on March 26, 2020. Id.

On July 31, 2020,[2] Petitioner filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court. (Doc. No. 1 at 10). This is Petitioner's first federal collateral challenge to the constitutionality of her confinement under the at-issue judgments of conviction. Following briefing concerning the petition's timeliness, the Court concluded that Petitioner had timely filed the petition and ordered the State to respond to the petition. (Doc. No. 15 at 105-07).

## II.  STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's trial as follows:

> This case relates to the strangulation death of seventy-two-year-old Hassie Pearl Breeding on December 10, 2010. At the trial, Teresa Breeding, the victim's daughter, testified that she unsuccessfully attempted to telephone the victim on December 11. Her nephew, Brandon, told her that he and his girlfriend were going to stop by the victim's house for a visit. She told Brandon that she had been unable to reach the victim all day and asked him to text Benjamin Bowers, also her nephew and the codefendant in this case, inquiring about the victim's whereabouts. She explained that the Defendant was Mr. Bowers's girlfriend and that the Defendant

---

[2] Under the "prison mailbox rule" of Houston v. Lack, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in Richard v. Ray, 290 F.3d 810, 812 (6th Cir. 2002) and Scott v. Evans, 116 F. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when she deposits her mail in the prison mail system to be forwarded to the Clerk of Court. Pursuant to this authority, the Court finds that Petitioner filed her petition on July 31, 2020, the date she signed the petition and submitted it to the prison authorities for mailing (Doc. No. 1 at 15), even though the Clerk of Court received and docketed the petition on August 10, 2020.

and Mr. Bowers had been living with the victim. She met the Defendant at Thanksgiving dinner the previous month.

Ms. Breeding testified that at 10:00 p.m. on December 11, 2010, she and her eight-year-old daughter drove to the victim's house. Her daughter remained in the car while Ms. Breeding entered the house. She noticed the lights were off, and the victim's 2006 silver Toyota Scion was gone. She said that when she entered one of the bedrooms, she saw a cover over something on the floor. When she removed the cover, she saw a pillow over the victim's face. She said the victim was cold and her skin was discolored. At the time she found the victim, Ms. Breeding was on the telephone with her niece, Jennifer Bolo. They each called 9-1-1. While Ms. Breeding was on the telephone with 9-1-1, she saw a cord around the victim's neck. Ms. Breeding identified a diagram of the victim's house and explained the layout. She identified a photograph of the victim lying on the bedroom floor and identified the pillow she removed from the victim's face. She identified photographs of the victim's car. She last saw the victim two or three days previously.

On cross-examination, Ms. Breeding testified that she was on the telephone with Ms. Bolo when she pulled into the driveway and noticed the lights were off and the victim's car was gone and that she asked her niece to stay on the telephone with her. She denied being afraid. She did not recall finding broken glass near the victim. She agreed she looked in Mr. Bowers's room and saw many holes in the walls. Although she never saw Mr. Bowers create the holes, to her knowledge, Mr. Bowers was responsible for them.

Ms. Breeding testified that the victim pinned money to the inside of her sock. She said she was looking for Mr. Bowers when she first entered the house because she wanted to ask him if he knew the victim's whereabouts. She spoke to the victim several times per week.

Billy Breeding, the victim's son, testified that he was a lienholder on the victim's car and that its value at the time of the victim's death was about $8000. On cross-examination, Mr. Breeding testified that he saw the victim as often as possible and that he interacted with Mr. Bowers very little. He denied knowing Mr. Bowers had a reputation for violence. He recalled, though, an incident when Mr. Bowers was a teenager during which Mr. Bowers shoved the victim. The police were called to the scene and talked to Mr. Bowers, but Mr. Breeding heard nothing else about the incident. Mr. Breeding talked to the victim about the incident.

Mr. Breeding testified that he knew holes existed in the walls of Mr. Bowers's bedroom but denied knowing who caused them. He did not recall telling a deputy investigating the victim's death that Mr. Bowers had a bad temper and was known for breaking things when he was angry.

Patricia Bilbrey, the victim's daughter, testified that she learned about the victim's death from her niece. She identified Mr. Bowers as her nephew and said he lived

4

with the victim. She said the Defendant was Mr. Bowers's girlfriend, who also lived at the victim's house. She said Mr. Bowers was about twenty or twenty-one years old at the time of the victim's death. She said the victim was about 5'4", weighed about ninety-eight pounds, and was in poor health with "crippling arthritis," a bad knee, and heart problems.

On cross-examination, Ms. Bilbrey testified that the victim had placed her money in her sock to prevent anyone from knowing where she kept it. She agreed Mr. Bowers had previously taken some of the victim's medication. She said the victim generally dreaded going home because the Defendant and Mr. Bowers left dirty dishes in the kitchen and clothes on the floor and because the Defendant yelled at the victim. She denied that the victim claimed Mr. Bowers was violent toward the victim. She admitted, though, the victim claimed Mr. Bowers had pushed the victim. She denied seeing Mr. Bowers act violently or yell at anyone. She was not surprised Mr. Bowers and the Defendant were suspects in the victim's death. She acknowledged she had not told the police that she was not surprised at the Defendant's involvement.

Overton County Sheriff's Deputy Tim Porter testified that he responded to the scene and that he found the victim lying on the floor with a cover over her legs and a red cord around her neck. A pillow was just above her head. She did not have a pulse, and paramedics declared her deceased.

On cross-examination, Deputy Porter testified that Deputy Steve Flowers began the crime scene log. He said a dog was on the back porch and did not know if the dog had been inside the house after the killing. He did not recall seeing a cat. He said the two paramedics were escorted inside the house to the victim's location, and two others came to the bedroom in which the victim was found. He denied those who entered the house wore protective coverings on their shoes. He did not recall Fire Chief Rocky Dial being at the scene. On redirect examination, he denied seeing Chief Dial inside the victim's house.

Tennessee Bureau of Investigation (TBI) Special Agent Steve Huntley testified that he arrived at the scene around 12:35 a.m. He said that Mr. Bowers and the Defendant were considered suspects early in the investigation and noted that they were missing, along with the victim's car. He entered the house after a search warrant was obtained, and the outside of the house was photographed and video recorded.

A recording of the crime scene was played for the jury while Agent Huntley narrated. The recording showed no broken windows or doors and no signs of forced entry. A cat was seen walking around inside the house. Agent Huntley noted that the victim was found inside Mr. Bowers and the Defendant's bedroom and that the victim was still wearing her jewelry. A red "dog cord" was found around the victim's neck. He noted the recording showed holes in the bedroom door and walls. Items were marked with evidence placards, including two hats, a black t-shirt, and

5

a red-brownish spot on the floor. Inside the Defendant and Mr. Bowers's bedroom, evidence placards identified the dog cord and wire cutters. In the entryway to the adjoining bathroom, a black ski mask with the eyes cut out and two black gloves were found. A lens from a pair of eyeglasses was found, and the respective broken eyeglasses were found in the bedroom with the victim. The blanket and the pillow that covered the victim were also identified. Outside the victim's house, a Chevy Blazer was parked in the driveway, and Agent Huntley noted the passenger-side window was broken and a screwdriver was lying nearby on the ground. Inside the Blazer, the victim's TennCare card was found.

Agent Huntley testified that the dog cord found around the victim's neck, the pillow and pillowcase, and the wire cutters were submitted to the TBI Crime Laboratory for analysis. He identified photographs of the victim after the blanket was removed, which showed a $20 bill protruding from the victim's left sock. He learned during the course of his investigation that the victim kept money in the socks she wore.

Agent Huntley testified that he and TBI agents traveled to Indiana where Mr. Bowers and the Defendant were found. The Defendant and Mr. Bowers had the victim's car, which Agent Huntley searched upon arriving in Indiana. The victim's utility bill was found inside the car. Also inside the car was a black purse containing keys, a pink cell phone, and a gold watch. In the front passenger seat, he found a handwritten note signed by the Defendant. The letter stated,

> Ben is the only person who has ... ever had my heart like this[.] I love him so much. If you have found this you obviously know what has happened. I want his last name on my grave & I want to be cremated w[ith] him. Kim Coffel would be my mother. She made me go this way. She's ignored all my signs for years. She isn't a mom & will never be one now.

The letter identified a telephone number for the reader to call and said Natalie "should know I love her & everyone else." The Defendant wrote she loved "Benjamin to[o] much. P/z d[o]n't break us apart." Agent Huntley stated that a black backpack was also found inside the victim's car.

Agent Huntley testified that the victim's car was taken to the local police department, and Mr. Breeding returned the car to Tennessee. Agent Huntley searched the car again after it was returned to Tennessee and found a Food Lion receipt dated December 10, 2010, at 9:13 p.m. and two toboggans. He said the toboggans were seen inside the car when it was searched in Indiana. He did not realize they were connected to the Defendant and Mr. Bowers until he saw video footage of them wearing the toboggans in Overton County. He said, "[T]ake right, go through Glasgow, take 65" was written on the back of the receipt.

Agent Huntley testified that he obtained video recordings from various places in Overton County, including a convenience store and Food Lion. He obtained

warrants for the Defendant's and Mr. Bowers's DNA, and the samples were submitted to the crime laboratory for analysis. He said the black gloves and ski mask found inside the victim's house were also submitted to the crime laboratory for analysis. He identified a photograph of a Kentucky Fried Chicken box found on the kitchen counter inside the victim's house and said the purchase receipt was dated December 10, 2010, at 5:07 p.m.

On cross-examination, Agent Huntley testified that he reviewed the log identifying who was allowed to enter the crime scene. He agreed several emergency workers were allowed inside the house after the victim was declared dead, and no legitimate reason existed for their entry. He also agreed the log did "not document[ ]" each time someone left the crime scene area. He did not know if everyone inside the crime scene wore gloves and protective coverings over their shoes.

Agent Huntley testified that the medical examiner gave him the victim's clothes and jewelry. Regarding the reddish-brown spot on the floor of the victim's house, he agreed that the property inventory stated that it was blood, that the substance was not analyzed, and that he did not know what it was. Regarding the red substance found on a door, he said the substance was not analyzed. Although he did not know the cause of death, he said the victim was clearly strangled.

Agent Huntley testified that his theory of the case was Mr. Bowers placed his foot on the victim's back and pulled the dog cord tight around the victim's neck. He said the Defendant's and Mr. Bowers's statements supported the theory. Wire cutters were collected from the Defendant and Mr. Bowers's bedroom and analyzed to determine if the cutters were used to cut the dog cord. He noted one piece of the dog cord was found around the victim's neck and another piece was found inside the Defendant and Mr. Bowers's bedroom. He agreed no evidence showed the Defendant touched the wire cutters, however, Mr. Bowers admitted to using the wire cutters to cut the dog cord.

Agent Huntley testified that he found a broken eyeglass lens on the floor near the victim and that the frames were lying on a pile of clothes in the same room. He did not know how the frames came to be on the pile of clothes. No fingerprints were found on the frames, and the frames were not analyzed for the presence of DNA or fibers. He agreed he did not obtain the Defendant's fingerprints, although he obtained Mr. Bowers's fingerprints. He denied the blanket found covering the victim was analyzed but said the pillow found on the victim's face showed the presence of the Defendant's and Mr. Bowers's DNA profiles. He said he did not know if the Defendant's living in the victim's house might explain the presence of her DNA on the pillow. He agreed the crime laboratory and the medical examiner were told the police suspected the victim was strangled and smothered. He considered the dog cord and the pillow as "instruments of death."

Agent Huntley testified that the Defendant was a suspect even before she gave her confession. He learned during the investigation that the Defendant was in the

bedroom when Mr. Bowers began choking the victim with the dog cord. He said the Defendant came out of the bedroom, placed a pillow over the victim's face, and smothered the victim. The Defendant stated that she was not asleep when Mr. Bowers began strangling the victim.

Agent Huntley testified that he believed the scene was staged to look like a "bad burglary" based on the ski mask and gloves found inside the house and the broken car window and screwdriver found outside the house. He denied the screwdriver was analyzed because Mr. Bowers admitted to breaking the car window with the screwdriver and agreed no evidence suggested the Defendant was involved with breaking the window. He did not see signs of a struggle inside the house and did not recall any abrasions to the victim's body. The victim's clothes were not analyzed because the police knew who killed the victim based on the investigation, the Defendant's and Mr. Bowers's confessions, and the presence of their DNA on the pillow. He noted that the Defendant and Mr. Bowers fled to Indiana in the victim's car and that the Defendant told two paramedics that she and Mr. Bowers killed the victim.

Agent Huntley testified that scrapings from under the victim's fingernails were analyzed for DNA but that none was found. He noted the victim was a frail, elderly woman who, according to the Defendant, could not fight back. Mr. Bowers was 5'9" to 5'10" tall and weighed about 160 pounds.

Agent Huntley testified that the video recording of the scene showed that a cat was inside the victim's house. He placed the cat in the master bathroom after he arrived. He did not know if the gloves found inside the house were for a man, but after examining them, he said they appeared to be for a "small" person. He could not identify an object on the victim's forefinger, but he said the object did not appear to be a fiber. He said the object could have been on the victim all day. He did not know if the ring on her forefinger was backward. He agreed that if the victim's ring was backward, it could have become "turned around" during a struggle or when her body was dragged. He denied having the victim's ring analyzed for DNA.

Agent Huntley testified that two of the holes in the door were created when Mr. Bowers became angry due to the Defendant's mother's threatening to report Mr. Bowers and the Defendant to the police. He identified holes in the wall of the Defendant and Mr. Bowers's bedroom. He said Mr. Bowers possessed the wire cutters before the victim came home.

Agent Huntley testified that the crime scene log failed to show when Detective Steve Hritz left the scene. He said, though, the log correctly reflected who entered the scene. He agreed his request to the crime laboratory stated that the Defendant and Mr. Bowers choked the victim with a dog cord and used a pillow to prevent her from breathing.

8

On redirect examination, Agent Huntley testified that he provided the statement of facts for the crime laboratory request after investigating the scene, collecting evidence from the medical examiner, and interviewing the Defendant and Mr. Bowers. He said Detective Hritz assisted him at the scene.

Agent Huntley testified that he attempted to corroborate the Defendant's confession with the physical evidence from the scene and Mr. Bowers's confession. The Defendant's confession was consistent with the evidence found at the scene, and Agent Huntley said the Defendant's and Mr. Bowers's confessions "pretty much matched." He agreed the Defendant's statement that she and Mr. Bowers attempted suicide corroborated her statement to the police that they wanted to go out with a bang.

Agent Huntley read to the jury the written statement Mr. Bowers provided to the police. In the statement, Mr. Bowers stated that his grandmother allowed him and the Defendant to live with her and that the victim treated them well. They used the bedroom across from the bathroom, which had the holes in the walls. He admitted stealing from the victim previously and knew the victim kept her money in a black pouch tucked in her sock. Mr. Bowers's only concerns in life, though, were his drug addiction and the Defendant.

On the day of the killing, Mr. Bowers said he and the Defendant stayed home, and they talked about how they "could be together." He said, "We figured we would kill my Grandmother and take her money." They packed their belongings before the victim arrived home, and he said the Defendant thought of choking the victim with a dog leash. He said the plan was for Mr. Bowers to approach the victim from behind and place the leash around her neck. He said he practiced on the Defendant to determine how best to do it. He cut the leash with the wire cutters and left them in their bedroom. He stated, "I guess ... me and [the Defendant] planned this out even premeditated what we did." When the victim arrived home at 5:30 p.m., Mr. Bowers approached her from behind, placed the leash around her neck, and choked her. He said he wore the black gloves during the attack. He yelled for the Defendant's assistance. The Defendant came from their bedroom with a pillow and placed it over the victim's face. The victim fell to the floor as Mr. Bowers applied pressure. As he pulled the leash as tight as possible, the Defendant held the pillow over the victim's face. The victim attempted to fight, and Mr. Bowers heard "a little sigh and gurgle." The Defendant laid her entire body on the victim and applied pressure on the pillow. After the victim was dead, Mr. Bowers took money from the victim's purse. He removed $420 from the victim's right sock. Mr. Bowers and the Defendant placed their belongings in the victim's car and left. Mr. Bowers and the Defendant bought gas, drove to Sparta to buy $200 worth of drugs, and drove to Indiana.

Mr. Bowers noted the Defendant spoke with her mother earlier that day. The Defendant's mother threatened to call the police "to get Kalyn home." Mr. Bowers threw the wire cutters into the bedroom door. He admitted breaking the window in

9

the Blazer when he attempted to remove the window to unlock the door and take the battery. He wanted to put the battery in his car, which would not start. He concluded his statement by saying "this was the only way me and Kalyn could think of being together." He claimed he would have done anything for the Defendant.

Agent Huntley testified that he considered the Defendant's and Mr. Bowers's statements to be consistent. He said the statements each referenced the same date and time of the killing, Mr. Bowers's placing the dog cord around the victim's neck, the Defendant's placing a pillow over the victim's face, and the motive for obtaining money and a car to get out of town. He said each statement also claimed that the killing occurred because the Defendant's mother threatened to report Mr. Bowers to the police. He agreed the evidence he submitted for analysis to the crime laboratory was based, in part, on the two confessions. On recross-examination, he stated that the Defendant admitted to attempting suicide three times within the twenty-four-hour period before her arrest.

TBI Special Agent Darrin Shockey testified that he assisted in the collection of evidence. He previously worked as a latent fingerprint examiner at the crime laboratory and said he and Agent Huntley discussed which items, if any, at the scene should have been examined for fingerprints. Agent Huntley asked his opinion regarding which items should have been analyzed. Agent Shockey said none of the items needed analysis, and his conclusion was based on the fact that the people involved in the killing most likely lived in the victim's house.

On cross-examination, Agent Shockey testified that he was not surprised that the eyeglasses were not analyzed for fingerprints. He agreed the agent in charge decided which items to analyze.

Overton County Sheriff's Detective Steve Hritz testified that emergency personnel and four deputies were at the scene when he arrived. He marked the evidence at the scene with placards and assisted in the collection of evidence. He said that on January 19, 2011, he and Agent Huntley searched the victim's car and collected the Food Lion receipt. He also assisted in the collection of surveillance videos from the Raceway Market in Livingston. On cross-examination, he stated that about ten people were inside the victim' house when he arrived and that many of them were in the bedroom where the victim was found.

Raceway Market Store Manager Ashley Ogletree testified that on December 10, 2010, she worked from 2:00 p.m. to 12:00 a.m. Although she did not know Mr. Bowers personally, she knew who he was and recognized him when he entered the store on December 10. Although she said Mr. Bowers was with a woman, she could not identify the woman in the courtroom. She said later, though, that she identified the Defendant as the woman at the juvenile court transfer hearing. She said Mr. Bowers entered the restroom, and the woman asked a few customers for directions to Indiana, asked to look at a map, and wrote down directions. The woman mentioned she was pregnant and was going to name her son Maverick.

10

Ms. Ogletree testified that the police obtained a video recording from the store, which was played for the jury. Ms. Ogletree narrated as the recording was played. She identified the Defendant, who reached for a map. The Defendant wore a pink and black toboggan. The Defendant realized she was looking at the wrong map and grabbed the correct map. Ms. Ogletree gave the Defendant paper and pen to write directions. Ms. Ogletree's son was behind the counter, and the Defendant mentioned she was pregnant. The Defendant acted "just normal" and was happy she was traveling to Indiana to visit relatives. Mr. Bowers walked into the store wearing a black toboggan. The Defendant and Mr. Bowers discussed paying for gas and whether Mr. Bowers wanted food or drink. Mr. Bowers left to pump gas, and the Defendant paid for it and left. Ms. Ogletree saw them leaving in a "silver hatchback."

Livingston Food Lion Store Manager Nathaniel Kennard testified that he was responsible for maintaining the store surveillance system. He described the locations of the cameras and said he retrieved the recording from December 10, 2010, which was played for the jury. Mr. Kennard stated that the recording was time stamped at 9:05 p.m. and showed a person leaving the store. He said the recording also showed a couple checking out at register three at 9:12 p.m. Mr. Kennard maintained an electronic journal of customer transactions and identified a $25.26 entry from the 9:12 p.m. transaction. He identified the Food Lion receipt previously entered into evidence and said it corresponded to the journal entry.

Rebecca Kinder testified that she was a paramedic in Grant County, Indiana and that she was working with fellow paramedics Yolande Bailey and Justin Black on December 12, 2012. She, Ms. Bailey, and Mr. Black responded to a possible drug overdose call at the Gas City Police Department. She learned that the Defendant "shot up ... nicotine water in a syringe." She examined the Defendant, and Ms. Bailey and Mr. Black examined Mr. Bowers. Ms. Kinder said the Defendant was upset and was wearing soaking wet clothes. The Defendant's vital signs were normal. She asked about the Defendant's clothes, and the Defendant told her that she had been in the bathtub at her grandparents' house with her boyfriend and that the "stuff on TV you see doesn't work." When Ms. Kinder asked the Defendant what she meant, the Defendant said "we" put electronic devices in the bathtub attempting to electrocute "ourselves."

Ms. Kinder testified that the Defendant claimed she felt nauseous and might have been pregnant. She said one of the officers asked the Defendant for her mother's contact information, but the Defendant refused and claimed her mother was a drunk who did not care about her. Ms. Kinder convinced the Defendant to provide the contact information, and she began to talk about the killing. The Defendant stated that she lived at her boyfriend's grandmother's house with her mother's consent but that her mother was going to force her to return home because her mother stopped receiving "finances of some type." The Defendant claimed her mother threatened to have her boyfriend arrested for statutory rape if the Defendant did not return home.

11

Ms. Kinder testified that the Defendant continued to cry and stated, "[I]t's never going to be okay, I shouldn't have done it, I shouldn't have hurt her, I just wish I hadn't done it." Ms. Kinder asked if someone needed medical assistance, and the Defendant said nobody could help because "she" was in Tennessee. The Defendant said, "[Y]ou can't help her, we killed her, oh my God, I wish I hadn't done that, oh my God, I wish I hadn't done that." The Defendant told Ms. Kinder that her boyfriend "got behind her, took a dog leash and strangled her and I put a pillow on her face and smothered her, oh my God, oh my God, I just wish I hadn't done it."

Ms. Kinder testified that although the Defendant was upset, her vital signs were normal, and Ms. Kinder found no medical problems to warrant treatment. The Defendant complained of an upset stomach, lay on the floor, and slept.

On cross-examination, Ms. Kinder testified that Mr. Bowers was in an adjacent room while she talked to the Defendant and that Mr. Bowers stared at the two of them while they talked. She agreed Mr. Bowers watched them closely. She also agreed the Defendant admitted to using drugs and to attempting suicide because "they ... wanted to be together forever." She said the Defendant looked liked she had not slept.

Ms. Kinder testified that the Defendant definitely said "we" killed the victim, not "he" killed her. She was positive the Defendant said she put the pillow on the victim's face and smothered the victim.

Yolande Bailey testified that on December 12, 2010, she worked as a part-time paramedic in Grant County, Indiana. She received an attempted suicide call and responded to the police department with Ms. Kinder and Mr. Black. She said the Defendant and Mr. Bowers were examined but not transported to the hospital. She said the Defendant did not receive medical treatment. She heard the Defendant tell Ms. Kinder about attempting suicide and killing Mr. Bowers's grandmother in Tennessee. The Defendant said Mr. Bowers "got behind the grandmother ... with a leash and then [the Defendant] got on top of her with a pillow." The Defendant said they killed the grandmother for money. On cross-examination, Ms. Bailey stated that the Defendant's clothes were soaking wet.

Indiana State Police (ISP) Sergeant Matthew Collins testified that on December 12, 2010, he was asked to help locate the Defendant and Mr. Bowers, who were wanted for questioning relative to a homicide in Overton County, Tennessee. He was provided information about the victim's vehicle because it was believed the Defendant and Mr. Bowers were traveling in the car. Overton County Sheriff's Deputy John Mackie asked him to investigate a house owned by Charles and Helen Vaunce, the Defendant's grandparents. He said the victim's car was found at the Vaunce's house. He said that Gas City Police took the Defendant and Mr. Bowers into custody and that they were at the police station when he arrived. He was advised that the Defendant stated she was involved in the murder of Mr. Bowers's

grandmother. Sergeant Collins drove to the Vaunce home to examine the victim's car, which was secured and towed to the Fort Wayne ISP Post. He spoke to Mrs. Vaunce and returned to the Gas City Police Department to interview the Defendant. Sergeant Collins testified that he read the Defendant her Miranda rights, that the Defendant read the form herself, that the Defendant said she understood her rights, and that she did not have any questions. The Defendant signed the waiver of rights form and provided a statement.

The Defendant's recorded statement was played for the jury. When asked for identifying information, the Defendant said she had "been [giving] it all day long." She asked if her mother knew what was happening. Sergeant Collins told the Defendant that her mother had been told it was important for the authorities to speak to the Defendant. The Defendant had been living with Mr. Bowers at his grandmother's house. On December 10, 2010, her mother called and was upset after receiving a notification she would not receive food stamp benefits if the Defendant did not live with her. The Defendant's mother said that she would have Mr. Bowers arrested for statutory rape and that the Defendant would be in trouble with the authorities. The Defendant might have been pregnant. After the call, the Defendant and Mr. Bowers got high by injecting Dilaudid. They discussed going "out with a bang." Mr. Bowers mentioned killing his grandmother. The Defendant did not want to see blood and recommended they use a dog leash as a weapon. When the victim came home from work, Mr. Bowers choked her with the leash, and the Defendant pushed a pillow on the victim's face. The victim made unusual noises and died after about two minutes. They dragged the victim's body into a bedroom and covered it with bed linens and a pillow. Mr. Bowers took $200 from the victim's body, and they took the victim's car to Indiana to visit the Defendant's relatives. The Defendant said she was sorry she had damaged the lives of Mr. Bowers, herself, and her unborn child. On the day she was taken into custody, she had tried to commit suicide three times. She and Mr. Bowers sat in a bathtub and put appliances in the water. They also tried to kill themselves in a car through carbon monoxide inhalation and by injecting nicotine water. She wished she were dead. Near the end of the interview, she asked if she could still have a lawyer.

On cross-examination, Sergeant Collins testified that the Defendant was taken into custody around 11:20 a.m. and that he did not recall if her clothes were wet. His interview of the Defendant began at 7:13 p.m. He did not know if the Defendant had eaten, had anything to drink, or used the restroom between her arrest and the interview. The Defendant did not appear sleepy or disoriented, and Sergeant Collins did not recall if she wore handcuffs during the interview. He agreed he thought it was important to talk to her when he did because she was a person of interest in a homicide.

TBI Special Agent Chuck Hardy, an expert in DNA analysis, testified that he analyzed various items found at the crime scene for the presence of DNA, including the ski mask, a pair of gloves, the pillow and pillowcase, the dog cord found around the victim's neck, and nail clippings from the victim. He was provided samples of

13

the victim's blood and the Defendant's and Mr. Bowers's DNA. Relative to the right glove, Agent Hardy found the presence of the Defendant's and Mr. Bowers's DNA. He said the probability of randomly selecting an unrelated individual who would have been a contributor to the DNA found on the glove was approximately one in 1.9 million for the African-American population, one in 38.5 million for the Caucasian population, one in 78.2 million for the Southeastern Hispanic population, and one in 40.6 million for the Southwestern Hispanic population. He concluded that the victim's DNA was not on the glove.

Agent Hardy testified that he found the presence of Mr. Bowers's and the Defendant's DNA on the ski mask. Regarding the Defendant's DNA, he concluded that the probability of an unrelated individual having the same DNA profile was approximately one in 946 for the African-American population, one in 231 for the Caucasian population, one in 327 for the Southeastern Hispanic population, and one in 352 for the Southwestern Hispanic population. Relative to the left glove, he found the presence of the Defendant's and Mr. Bowers's DNA.

Agent Hardy testified that he did not examine the pillow but that he examined the pillowcase. He found a stain on the pillowcase, and his testing failed to show the presence of blood. He found the Defendant's and Mr. Bowers's DNA on the pillowcase. Regarding the Defendant's DNA, he concluded that the probability of an unrelated individual having the same DNA profile was the same as the statistics regarding the right glove. He said that he swabbed the outer perimeter of the pillowcase and that he excluded the presence of the victim's DNA. Regarding the dog cord, an insufficient amount of DNA was found, preventing his excluding the presence of the Defendant's, Mr. Bowers's, and the victim's DNA profiles. His findings were inconclusive.

On cross-examination, Agent Hardy testified that if a cat had walked on the evidence, it were possible but unlikely that the analyses could have been affected. He said that if a cat walked through the scene multiple times, it would increase the chances of contamination but that casual walking from one place to another would not be enough to be detected in the analyses.

Agent Hardy testified that he found a mixture of DNA on the edges of the pillowcase and that based on his analysis, the mixture included DNA from the Defendant and Mr. Bowers. He excluded the victim as a contributor to the DNA mixture. He agreed that if someone had a bleeding cut or wound, it would increase the likelihood of transferring DNA onto a foreign object. He said, too, that the likelihood of transfer increased when the foreign object had a rough surface.

Agent Hardy testified that he analyzed the ski mask at the eye and mouth openings because that was the most likely location of DNA. He agreed that if someone were gasping for breath or trying to scream for help, the likelihood of transferring DNA from the mouth would increase. Relative to the pillowcase, he said he analyzed the edges because of the State's theory that the victim was strangled and smothered

14

with a pillowcase. He agreed he did not find the victim's DNA on the areas analyzed. Regarding his decision not to analyze the center of the pillowcase, he said the probative evidence was not the location of the victim's DNA because the pillow was found on the victim. He said the probative evidence was identifying the DNA of who might have held the pillow over the victim's face.

Agent Hardy testified that the presence of the Defendant's and Mr. Bowers's DNA on the pillowcase might be explained by their living in the house. When asked if his analyses proved the Defendant used the pillow to smother the victim, he said that his analyses only showed the presence of the Defendant's and Mr. Bowers's DNA and that he could not determine how the DNA was deposited on the pillowcase.

On redirect examination, Agent Hardy testified that his examination of the pillowcase probably would not have changed had he known the Defendant stated she had smothered the victim with the pillow. He agreed the Defendant's confession might explain why the Defendant's DNA was on the pillowcase.

Dr. Adele Lewis, an expert in forensic pathology, testified that she performed the victim's autopsy. She said generally, medical examiners needed investigative information from the police in order to determine a cause and manner of death. She said that certain causes of death could not be determined by an autopsy and that the only way to make a diagnosis was to use the history provided by law enforcement. Regarding strangulation, she said ligature marks in the muscles of the neck and breaking of the hyoid bone in the front of the neck were findings consistent with strangulation. She said "a fair" amount of force was needed to break the hyoid bone. Regarding smothering, she said information from investigating police officers was critical because medical examiners were prohibited from determining a cause of death if a plastic bag were removed from a person's head prior to notifying the police. She said petechial bleeding was also an indication of strangulation and might indicate smothering.

Dr. Lewis testified that before she performed the autopsy, the police told her the victim was found on the floor with a red cord around her neck and a pillow on her face. She concluded to a reasonable degree of medical certainty that the cause of death was asphyxia due to strangulation and smothering and that the manner of death was a homicide. She said usually no physical evidence of smothering was found but noted the victim had petechial hemorrhaging in the eyes, which could have been caused by strangulation or smothering. She identified photographs of the victim's hyoid bone and of the ligature mark on her neck caused by a rope-like object. She concluded that the hyoid bone was broken and noted that she found antemortem bleeding in the bone. She identified a photograph of petechial hemorrhages in the victim's right eye and a photograph of the victim's face, which showed petechiae of the skin around the eyes and an abrasion to the forehead between the eyes. Dr. Lewis noted that the victim's nose was clearly crooked but could not determine whether the nose was injured at the time of death. The victim

15

was 64.5" tall, weighed 102 pounds, and was in fairly good health at the time of her death. No drugs were found in the victim's system.

On cross-examination, Dr. Lewis testified that she would not have concluded the victim was smothered had the police not told her about the pillow covering the victim's face and that the evidence she found indicated strangulation as the cause of death, including the ligature marks around the victim's neck and the broken hyoid bone. She noted the hyoid bone was broken in two places. She agreed "quite a bit of force" was needed to break the hyoid bone and said someone with "a little bit of strength or somebody with a rope or a rope-like object" could have broken the bone.

Dr. Lewis testified that the victim had abrasions on her elbows, shoulder, and hip. She said that although it was possible a struggle occurred at the time of the victim's death, she was unable to date the abrasions. She noted a subgaleal hemorrhage to the top of the victim's head and said it could have been caused by blunt injury. No brain swelling was found, which might indicate the victim died quickly, and no obstructions were found in the victim's throat. She did not find fibers in the trachea or lungs. She found fluid in the victim's lungs and said although it was common to see fluid in the lungs, fluid alone did not necessarily mean the victim died quickly. On redirect examination, Dr. Lewis testified that her findings were consistent with the victim's dying two minutes after the strangulation began. On recross-examination, she stated that the blood vessels located in the neck flowing to and from the brain were cut off during the strangulation. She agreed the victim could have been unconscious in a matter of seconds.

In the interest of judicial efficiency, the Defendant was permitted to call a witness during the State's proof. Dr. James Walker, an expert in forensic psychology, testified that he evaluated the Defendant after reviewing mental health and medical treatment records and information regarding the present case. He said her previous treatment records showed that she underwent a psychological exam at the Volunteer Behavioral Health Center, underwent a neurological examination in November 2010, and received psychotherapy and psychiatric services at the Personal Growth and Learning Center. He was provided the "suicide note" previously written by the Defendant, her police statement, and the police reports.

Dr. Walker interviewed the Defendant on May 21, 2012, administered several psychological tests, and obtained a personal history. Mr. Walker concluded that the Defendant had multiple "serious" mental health disorders. He concluded the Defendant had major depression in which she experienced frequent "spells of low mood" lasting for more than two weeks. He said other symptoms included low energy, difficulty sleeping, guilty thoughts, preoccupations, loss of appetite, and suicidal thoughts.

Dr. Walker also diagnosed the Defendant with post-traumatic stress disorder as a result of the Defendant's suffering serious trauma and abuse from her father. She

16

claimed she was beaten by her father, sexually abused "over the years," and involved in abusive romantic relationships. Dr. Walker, likewise, concluded that the Defendant suffered from attention deficit hyperactivity disorder in which she had difficulty controlling her behavior. He said the symptoms included impulsivity, difficulty paying attention, and being overly distracted. He noted the Defendant's neurologist concluded that she had the disorder one year before the killing. Dr. Walker noted that the Defendant had chemical dependence disorders associated with pain medication, methamphetamine, benzodiazipine, and alcohol. He further concluded that the Defendant had dependent personality characteristics. The Defendant formed very dependent attachments with others who were stronger willed than she and who she perceived as smarter, brighter, older, and more attractive. He said the Defendant tended to do what others wanted.

Dr. Walker testified that the Defendant complained of a significant degree of introversion and expressed difficulty making friends. Based on a suggestibility test, he concluded that the Defendant was very susceptible to being led or misled and that she had a propensity for being overly suggestible. He said her relationship with Mr. Bowers was "a very disturbed ... sick relationship." He described the Defendant's multiple motivations for being with Mr. Bowers. He said that the Defendant did not have a good relationship with her mother and felt like an outcast among her family and that Mr. Bowers provided her a place to live. Dr. Walker believed the Defendant developed a very strong emotional attachment to Mr. Bowers, although he physically abused, raped, and controlled her.

Dr. Walker testified that although he did not form an opinion about whether the Defendant was capable of premeditation on the day of the killing, he concluded that her ability to premeditate was significantly impaired. He said the Defendant was abusing Dilaudid, which caused "gross intoxication in most people." The Defendant was also taking Suboxone, a medication designed to help people stop abusing pain medication. He said these drugs affected the ability to reason, think, and make good decisions. He concluded to a reasonable degree of medical certainty that the Defendant was not "in a state where she could exercise good reasoning or ... judgment" based on the drug abuse, mental disorders, and abusive relationship with Mr. Bowers.

Dr. Walker testified regarding the Defendant's confession that the Defendant's emotional state and her willingness to take responsibility for the killing were factors consistent with her providing a truthful statement. He said, though, that other factors raised concerns about the truthfulness of her statement. The Defendant told Dr. Walker that she and Mr. Bowers discussed what they would tell the police if they were caught. The Defendant claimed that Mr. Bowers said he would not "go[ ] down" for the killing alone and would "take her with him." The Defendant admitted to Dr. Walker that she and Mr. Bowers conspired about what "they" would admit and what she would admit. He noted the Defendant feared Mr. Bowers generally. The Defendant told Dr. Walker that Mr. Bowers would attempt to harm

17

her. The Defendant claimed Mr. Bowers raped her twice and threatened to kill her after they fled the state.

Dr. Walker testified that the Defendant's tendency to be very suggestible led him to question the truthfulness of her police statement. He noted the Defendant's willingness after the killing to attempt suicide upon Mr. Bowers's suggestion. He agreed the Defendant admitted attempting suicide previously by cutting herself or taking pills, injecting nicotine into her veins, ingesting carbon monoxide, and placing a hair dryer into a bathtub of water. Dr. Walker stated that the Defendant's attempt to take her life after the killing should be considered in determining the veracity of her confession. He said people in disturbed relationships, like the Defendant and Mr. Bowers's relationship, sometimes "project a front to the world of having it altogether ... being loving, being affectionate to one another." He said this could explain the Defendant's normal demeanor after the killing.

On cross-examination, Dr. Walker testified that he did not administer the MMPI test because the test was inappropriate for a seventeen-year-old girl. He said a subject needed to be at least eighteen years old.

Dr. Walker testified that the previous records he reviewed showed the Defendant had met with two physicians once each, a support staff member with a master's degree once, and another support staff member several times. He agreed he had copies of the Defendant's statements to Yolande Bailey and Rebecca Kinder. Dr. Walker could not say if the Defendant was truthful and accurate in her statement to him. He agreed the Defendant was the only person who might benefit from lying to him.

Dr. Walker testified that the Defendant's psychomotor skills were normal, that she was alert and oriented, that her speech was fluent and articulate, and that her language comprehension was intact. He agreed the Defendant did not suffer from preoccupations, obsessions, or delusions. The Defendant's affect was normal, her social skills were good, and she was cooperative. She showed no signs of malingering and had an IQ of 95, indicating an average range of intellect. He agreed that the Defendant showed no signs of deficiencies in her ability to reason or to think and showed no signs of dysfunction in her executive reasoning abilities.

Dr. Walker testified that his post-traumatic stress and attention deficit hyperactivity diagnoses were based upon the Defendant's 2010 neurological examination. Regarding the Defendant's substance abuse problems, he agreed the Defendant had been drug free for months before the evaluation but said his "review of the records indicated a different story was more accurate." He said that although the Defendant lied, he was required to consider her statements in light of all the evidence. He said that the Defendant's statements were the only evidence of Mr. Bowers's raping, beating, and controlling her. He said that although it was possible the Defendant provided false or misleading information during the evaluation, indications showed that some information was true.

18

Dr. Walker testified that trial counsel asked him to clarify in a second report whether the limitations in the Defendant's mental condition on the day of the killing would have been due to a mental disorder or defect. After reviewing his original report, he agreed he concluded that the Defendant's confession to the police was not the result of duress or coercion. He agreed that the Defendant complained of a headache on the day of the killing, denied going to school, said she argued with her mother on the telephone, and said Mr. Bowers insisted upon listening to her conversation. This statement was consistent with her police statement, but Dr. Walker acknowledged the remainder of her statement to him was inconsistent with her police statement. He agreed the Defendant's telling him that she called her mother to pick her up and that Mr. Bowers was upset about the Defendant's relationship with her friend Natalie was the first time the Defendant had ever mentioned these topics. He, likewise, agreed that when he first interviewed the Defendant, she first mentioned her mother's not coming to pick her up, Mr. Bowers's placing the dog cord around her neck and threatening to kill her, and exchanging punches with Mr. Bowers. He said it would not surprise him that many of the Defendant's belongings were not packed and that no ligature marks were on the Defendant's neck when she was arrested. He agreed the Defendant's telling him that she vomited upon seeing Mr. Bowers strangle the victim and that she played no role in the killing was inconsistent with her police statement.

Dr. Walker testified that although he thought it was odd the Defendant slept after Mr. Bowers allegedly threatened to choke her with the dog cord, he said the Defendant was using Dilaudid, which usually caused the person to sleep. He agreed, though, that the Defendant never mentioned to him that she was using drugs. He said it was accurate to conclude that the Defendant used drugs on the date of the crime, whether or not she participated in the killing. Dr. Walker was unaware the Defendant's DNA was found on the pillow covering the victim's face and said the Defendant denied placing the pillow on the victim. He agreed it was possible the Defendant lied. He agreed that although the Defendant told the police she received a portion of the money that was stolen from the victim, she did not tell him that she received money. The Defendant also did not tell Dr. Walker that they drove to Sparta to buy drugs after the killing.

Dr. Walker testified that the Defendant's ability to premeditate was not impaired on the day he conducted his evaluation. The Defendant told Dr. Sandra Phillips that she did not use drugs on the day of the killing, and Dr. Walker admitted this conflicted with what the Defendant told him. He agreed the Defendant lied to him or to Dr. Phillips. He denied the Defendant told him that she and Mr. Bowers went to different stores to buy items after the killing, and he admitted this was important information.

Dr. Walker testified that the video recordings from the convenience and grocery stores indicated that the Defendant did not provide a complete account of what happened on the day of the killing. He said that he was not surprised that the

19

Defendant looked at a map and planned how to drive to Indiana just after the killing but that it did not impact his conclusions. He said he did not have to believe the Defendant was truthful for his assumptions to be accurate. He believed that the Defendant was honest at times and misleading at others. He noted Mr. Bowers's threatening to push her into the lake and said the statement was probably true given the detail of her statement. He said if the statement were false, she would have said Mr. Bowers told her that she would drown, not die of hypothermia. He conceded it was possible the Defendant created this detail after having more than one year to think about it.

On redirect examination, Dr. Walker testified that many of the Defendant's statements to him were corroborated by previous reports he reviewed and that the reports from the Defendant's previous doctors corroborated his diagnoses. He said the Defendant's behavior after the killing was "perfectly consistent" with his diagnoses. When told that no evidence had been presented showing the victim's DNA was on the pillow, he said that the lack of DNA was consistent with the Defendant's statement during his evaluation. On recross-examination, he agreed the Defendant knew right from wrong and was able to conform her conduct with that reasoning. On further redirect examination, he stated, though, that the Defendant's ability to premeditate might have been impaired on the day of the killing.

Dr. Sandra Phillips, an expert in the field of clinical psychology, testified that she was employed with Volunteer Behavioral and that she evaluated the Defendant on February 1, 2011, less than two months before the trial. Based on her evaluation, she concluded that the Defendant was competent to stand trial and was not mentally ill. She diagnosed the Defendant with adjustment disorder with a depressed mood. She explained the Defendant had a relatively low level of depression in response to her legal concerns. She also provisionally diagnosed the Defendant with post-traumatic stress disorder and with emerging borderline personality traits.

Dr. Phillips testified that she concluded the Defendant did not have a severe mental disease or defect at the time of the killing rendering her unable to appreciate the nature or the wrongfulness of her conduct. She also concluded that the Defendant was capable of premeditation on the day of the killing. She noted the Defendant reported emptying her backpack at the victim's house in order for other people to learn she had been at the house in the event something happened to her. The Defendant denied using drugs before the killing, although Dr. Phillips later learned the Defendant told the police she had used drugs.

Dr. Phillips testified that the Defendant denied participating in the killing. The Defendant told Dr. Phillips that the victim arrived home around 5:30 p.m. and that the Defendant was in the bedroom packing her belongings. The Defendant was "somewhat calmer" but worried about what was going to happen because after taking a shower, Mr. Bowers placed a dog cord around her neck, pulled it, and laughed. The Defendant suspected Mr. Bowers was going to kill her or the victim

20

because earlier that day Mr. Bowers threatened to "strangle the b——." The Defendant denied using drugs and drinking alcohol for several weeks. The Defendant overheard Mr. Bowers and the victim arguing about a broken car window and a hole in the bedroom door. The Defendant claimed Mr. Bowers threw things at her, which caused the hole, and called her a "stupid c——." The Defendant wanted to call her mother, but she could not find the house telephone and Mr. Bowers had her cell phone. The Defendant reported that after the arguing, she heard nothing. Then, she heard something falling down. The Defendant said she was "frozen terrified."

Dr. Phillips testified that the Defendant described the killing. The Defendant saw Mr. Bowers with his feet against the victim's back while he choked the victim with the dog cord. The Defendant dropped to her knees and asked Mr. Bowers, "God, what have you done[?]" Mr. Bowers struck the Defendant on the head and said, "[N]one of that God s——, it's hail Satan, my dark lord master." The Defendant claimed the victim was lying on the floor in the hallway. Mr. Bowers walked away and returned with a gun. He pointed it at the Defendant, told her to get up and to get in the car, and threatened to kill her if she attempted to run or "do anything stupid." The Defendant claimed to have emptied her backpack inside the house so the authorities and her family would know she had been there.

Dr. Phillips testified that the Defendant reported that Mr. Bowers showed her $400 he took from the victim's body. They drove to Sparta, where Mr. Bowers bought $200 to $300 worth of Dilaudid. Mr. Bowers told the Defendant that she had two days to live because he believed the victim would be found by then. The Defendant and Mr. Bowers stopped at Standing Stone, and the Defendant believed he was going to kill her. They stopped at a bridge, and Mr. Bowers grabbed her hair, shoved her face over the wall, and threatened to kill her if she refused to do what he wanted. The Defendant claimed the killing occurred because she was going to leave Mr. Bowers, who told her that she was supposed to have loved him and that nobody could have her if he could not.

Dr. Phillips testified that the Defendant said Mr. Bowers drove to Indiana in order for the Defendant to see her grandmother one last time before he killed her. During the drive, Mr. Bowers talked about the humorous look on the victim's face and the victim's inability to defend herself. Mr. Bowers told the Defendant that he placed the victim's body in the second bedroom, made the victim presentable, and covered her face with a pillow. The Defendant claimed that she somehow obtained her cell phone when they stopped at the rest area and wanted to call a friend but realized that the volume was too high and that Mr. Bowers could hear any conversation. Mr. Bowers saw the Defendant with her phone and escorted her to the car. Mr. Bowers told her to remove her pants, and when she refused, he tore off her pants and underwear and raped her.

Dr. Phillips testified that the above version of events was inconsistent with the Defendant's statement to the police in Indiana. She noted the Defendant mentioned

21

to her about going to the convenience store and to Food Lion after the murder. She did not know if the Defendant was truthful.

On cross-examination, Dr. Phillips testified that she reviewed the Defendant's previous medical records and agreed that the Defendant was raised in an abusive home. She agreed the Defendant's father abused the Defendant, the Defendant's mother, and the Defendant's stepmother. She agreed the abuse had a severe adverse effect. She read Dr. Walker's report and agreed the Defendant had "severe mental illness." Although the Defendant gave three different versions of the events, Dr. Phillips did not think the Defendant was malingering.

Dr. Phillips testified that the Defendant's relationship with Mr. Bowers was abusive based on the Defendant's statement. She denied administering tests to determine the Defendant's level of susceptibility and said that such tests would not show the Defendant's mental condition on the day of the offense. She disagreed with Dr. Walker's conclusion that the Defendant could have lacked the ability to commit premeditated murder. She agreed, though, that the Defendant had "less than the average capacity of a normal person."

On redirect examination, Dr. Phillips testified the Defendant had the ability to form the required intent of premeditation. On recross-examination, she stated that a clinical psychologist was not able to determine definitively whether the Defendant had a diminished capacity at the time of the killing. She agreed, though, with Dr. Walker's conclusion that the Defendant "could have been diminished."

Dr. James Girard testified for the defense as an expert in DNA analysis. He reviewed Agent Hardy's report regarding the DNA analyses. He agreed with portions of the Agent's conclusions but disagreed with others. Relative to Agent Hardy's analysis of the pillowcase, Dr. Girard said Agent Hardy assumed the victim was "not included in the analysis." Dr. Girard stated that the DNA sample was a mixture of three contributors, including the victim. With regard to the statistics of another person matching the DNA profiles found on the pillowcase, Dr. Girard believed Agent Hardy overstated the data. He concluded that the high million numbers reported by Agent Hardy were inaccurate.

Dr. Girard testified that he expected the victim's DNA to be on the pillow if it were laid on the victim's face. He agreed with Agent Hardy regarding the number of variables that played a role in whether DNA would be transferred to the pillow from the abrasion on the victim's forehead. He expected that more DNA would be found on the pillow if it were used to smother the victim.

On cross-examination, Dr. Girard testified that if the victim were smothered with the pillow, he would expect to find the victim's DNA on the perimeter of the pillow where Agent Hardy swabbed it. He said that a small dog was present at the scene and that the dog may have contaminated the DNA evidence. He agreed the documents he received did not mention the dog and said trial counsel told him a

22

small dog was present. He admitted he should have also considered during his analysis the Defendant's confessing to using a pillow to smother the victim.

Dr. Girard testified that he disagreed with Agent Hardy's conclusions regarding the right and left gloves and the ski mask because the samples analyzed were of such a low concentration that the profiles could not be determined confidently. He agreed with Agent Hardy's conclusion that the DNA analysis was inconclusive regarding the section of the cord found around the victim's neck, although Dr. Girard's report found the Defendant's DNA was not present on the cord. He agreed that the victim's DNA was the only DNA present in the nail clippings and said he would not have expected any other DNA to be found based on evidence that the victim was unable to defend herself and had arthritic hands.

On redirect examination, Dr. Girard testified that he knew the State's theory was the victim was smothered with a pillow. He said that based on the State's theory, he would have expected to find the victim's DNA on the pillow and that her DNA was not on it. He said that had he known a cat was inside the crime scene, rather than a dog, his conclusions would not have changed.

Dr. Girard testified that he disagreed with Agent Hardy's conclusions that the victim's DNA was not present on the items analyzed and that Agent Hardy's excluding her DNA profile "drastically change[d]" the results. He agreed that the results would have been in the Defendant's favor had the victim's DNA not been excluded. He agreed with Agent Hardy's conclusion that the DNA analysis was inconclusive regarding the dog cord found around the victim's neck and said it was possible the DNA evidence degraded between the time the evidence was collected and analyzed.

Kimberly Coffel, the Defendant's mother, testified that her relationship with the Defendant's father was abusive and that the Defendant witnessed the abuse. On one occasion, the Defendant's father picked up Ms. Coffel by her throat while the Defendant was present. The Defendant cried and said, "[P]lease stop, please stop." She said the Defendant did not understand what was happening when the Defendant's father became violent.

On cross-examination, Ms. Coffel testified that she talked to the Defendant on the day of the killing. She denied she told the Defendant to return home because she had stopped receiving food stamp benefits. She also denied threatening to report the Defendant and Mr. Bowers to the police for committing crimes. Ms. Coffel said she told the Defendant to come home and that she did not want to involve the police. When asked if she threatened to have Mr. Bowers arrested for statutory rape, she said she told the Defendant that she could have Mr. Bowers put in jail. The Defendant had been living with Mr. Bowers for one month. Ms. Coffel admitted she did not know where they were staying.

23

Insurance Agent Rick Savage testified that he last saw the victim in September or October before the killing. The victim came to his office. She was upset about something related to her grandson, and he advised her to contact the sheriff's department.

Overton County Sheriff D.W. Melton testified that he knew the victim and saw her on several occasions before her death. The victim spoke to him about her grandson, and he advised her to throw Mr. Bowers out of her house. He saw bruises on the victim's arm the last time she came to the sheriff's office to talk to him, and he said the victim was upset each time they talked.

Tina Webb testified that she knew the Defendant and saw her at Food Lion thirty days before the killing. They exchanged pleasantries, and at the end of their conversation, the Defendant "clammed up." Ms. Webb was unsure why the Defendant's demeanor changed but noticed Mr. Bowers was approaching at that time. She felt as though the Defendant "cut her off" and something was wrong.

On cross-examination, Ms. Webb testified that she did not know what occurred after she saw the Defendant but before the killing. On redirect examination, she stated that the Defendant was very happy and that it was unusual for the Defendant to clam up.

Chelsea Hanna testified that she had known Mr. Bowers for about ten years. She said they dated on and off for eight years, lived together twice, and were engaged to be married twice. They had lived with the victim. She saw the victim and Mr. Bowers argue but denied witnessing physical violence.

Ms. Hanna testified that in June 2010, Mr. Bowers moved into her apartment after Mr. Bowers attended a rehabilitation program. Mr. Bowers lived with her until September. She said that while they lived together, Mr. Bowers took many of her belongings and sold them. Mr. Bowers was unemployed, and Ms. Hanna expected Mr. Bowers to "take care of things ... pick up after himself." She said they argued when they discussed her expectations. She said Mr. Bowers yelled, screamed, and punched holes in the walls when he became angry. She only saw Mr. Bowers punch holes in the walls at the victim's house. During their last argument, the Defendant threw her on the floor and punched her.

On cross-examination, Ms. Hanna testified that she never killed anyone during the time in which she dated and lived with Mr. Bowers. On redirect examination, she stated that she had never been diagnosed with any severe mental disease.

Upon this evidence, the jury found the Defendant guilty of first degree murder, felony murder during the commission of an especially aggravated robbery, conspiracy to commit first degree murder, especially aggravated robbery, and theft of property. The trial court merged the murder convictions and sentenced the Defendant to life imprisonment with the possibility of parole. The Defendant was

24

later sentenced to concurrent sentences of fifteen years for conspiracy to commit first degree murder, fifteen years for especially aggravated robbery, and two years for theft.

State v. Polochak, 2015 WL 226566, at *1-18.

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's post-conviction hearing as follows:

> The petitioner filed a timely petition for post-conviction relief, alleging that she was deprived of the effective assistance of counsel at trial. Among her challenges to trial counsel's performance, she complained "that written statements by Mr. Bowers should not have been read as evidence as it violated her Sixth Amendment Right to cross-examination."
>
> Although the petitioner raised myriad instances of allegedly deficient performance, she indicated at the June 2018 evidentiary hearing that she intended to focus on claims that counsel did not allow her to testify at the suppression hearing, that counsel failed to procure the testimony of an expert in abusive relationships, that counsel failed to request DNA analysis of certain evidence, that counsel did not object to the State's violating evidence rule 615, that counsel failed to offer evidence of the petitioner's intoxication during her interrogation, that Mr. Bowers' statement should not have been read to the jury, and that counsel should have requested an independent autopsy. Because the sole issue on appeal is the admission of Mr. Bowers' statement, we will confine our recitation of the evidence offered at the hearing to this issue.
>
> The petitioner did not testify at the evidentiary hearing. Trial counsel testified that he had "a vague remembrance of" the admission of Mr. Bowers' statement but that he could not recall "exactly what those statements said." He also could not recall whether he had objected to the statement's admission. He explained that "the main intent of our strategy" was to blame Mr. Bowers for the murder and that the more evidence counsel could present to "show that he was responsible, the better for our case." In consequence, he said, "I would have to review the exact statement, see exactly what it was to say why I objected or why I didn't object. I don't know the answer to that right now." During cross-examination by the State, trial counsel added:
>
>> I would assume, without now remembering what the statement said, that he basically admitted to the crime. If he did inculpate her, I think one thing we tried to bring up was that he wanted to take her down with him and he would have every reason to do that.

After being allowed to review the portions of Mr. Bowers' statement that had been read to the jury, trial counsel said that he believed the statement supported the theory of the defense, explaining,

> It also supported the fact that [the petitioner] had made the statement ... that Mr. Bowers and she had gone over what to say when he was threatening to kill her and those kinds of things. So what, what she said he told her to say was in the statement as to what happened. It corroborated it from that extent.

He said there were "[m]ultiple reasons" for allowing the statement into evidence.

The post-conviction court denied relief, finding that the petitioner had failed to prove by clear and convincing evidence facts to support her claims of ineffective assistance of counsel. Relevant to this appeal, the post-conviction court found that trial counsel "did not object to the use of [Mr. Bowers'] statement to law enforcement during trial. It was a defense strategy to shift blame to [Mr. Bowers] and the use of [his] statement served that purpose."

Polochak v. State, 2019 WL 5692112, at *4.

## III. STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." Woodford v. Garceau, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." Burt v. Titlow, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Id.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 405 (2000). Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" Hill v. Curtin, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting Lockyer v. Andrade, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Harris v. Haeberlin, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520-21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations may be found unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Pouncy v. Palmer, 846 F.3d 144, 158 (6th Cir. 2017) (quoting Matthews v. Ishee,

27

486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011) (citing Byrd v. Workman, 645 F.3d 1159, 1172 (10th Cir. 2011)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410). Subject to Habeas Rule 7, review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (citation omitted); Gray v. Netherland, 518 U.S. 152, 162-63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. See Picard v. Connor, 404 U.S. 270, 275 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the TCCA. Adams v. Holland,

330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). Claims that are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." Alley v. Bell, 307 F.3d 380, 388 (6th Cir. 2002).

A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on the procedural bar as an independent basis for its disposition of the case." Caldwell v. Mississippi, 472 U.S. 320, 327 (1985). Second, if a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is technically exhausted (given that there is nothing additional the petitioner could do to obtain relief in state court), but a petitioner is not automatically entitled to present his claim on federal habeas review, as his claim is procedurally defaulted. Woodford v. Ngo, 548 U.S. 81, 126 (2006).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." Id. at 386. The burden of showing cause and actual prejudice to excuse defaulted claims is on the habeas petitioner. Coleman v. Thompson, 501 U.S. 722, 750 (1991); Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. Id.

Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. Murray, 477 U.S. at 488-89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to

29

the state courts as an independent claim before it may be used to establish cause. Id. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can be used as cause for the underlying defaulted claim only if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. See Martinez v. Ryan, 566 U.S. 1, 5-6 (2012) (creating an exception to Coleman where state law prohibits ineffective assistance claims on direct appeal); Trevino v. Thaler, 569 U.S. 413, 429 (2013) (extending Martinez to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); Sutton v. Carpenter, 745 F.3d 787, 792 (6th Cir. 2014) (holding that Martinez and Trevino apply in Tennessee). The Supreme Court's creation in Martinez of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." Martinez, 566 U.S. at 13. In other words, Martinez requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." See id. at 13-15. Importantly, Martinez did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in Coleman.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." <u>Perkins v. LeCureux</u>, 58 F.3d 214, 219 (6th Cir. 1995) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." <u>Simpson v. Jones</u>, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. <u>Dretke v. Haley</u>, 541 U.S. 386, 392 (2004) (citing <u>Murray</u>, 477 U.S. at 496). A petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>McQuiggin v. Perkins</u>, 569 U.S. 383, 399 (2013) (internal quotation marks omitted) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). For a petitioner to "pass through the gateway" and be permitted to argue the merits of his defaulted claims, he must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." <u>Id.</u> at 401 (internal quotation marks omitted) (quoting <u>Schlup</u>, 513 U.S. at 316).

With these principles in mind, the Court will turn to the examination of the claims raised in Polochak's petition for habeas relief.

IV.  <u>ANALYSIS</u>

Petitioner is not entitled to relief under Section 2254 because her claims are without merit or or are procedurally defaulted without sufficient cause. The Court will address each category of claims in turn.

31

A. Exhausted Claims

The Court begins with Petitioner's exhausted claims. They are 1) Ground One (Eighth Amendment cruel and unusual punishment claim) and 2) Ground Four (Fifth Amendment Miranda claim). The TCCA's resolution of these claims was not unreasonable.

1. *Eighth Amendment Cruel and Unusual Punishment Claim (Ground One)*

Petitioner's first ground for relief alleges that the mandatory life sentence she received for her conviction for first-degree murder violates Miller v. Alabama, 567 U.S. 460 (2012), Montgomery v. Louisiana, 577 U.S. 190 (2016), and the Constitution's prohibition of cruel and unusual punishment. U.S. Const. Amend. VIII, XIV.

Petitioner properly exhausted this claim on direct appeal to the TCCA. (See Doc. No. 20-24 at 2330-34). The TCCA addressed the claim on the merits and found that Petitioner was not entitled to relief. Polochak, 2015 WL 226566, at *33-34. Even though Petitioner exhausted this claim, however, the court need not assess it on the merits because the claim is now moot.

Last November, the Tennessee Supreme Court decided State v. Booker, 656 S.W.3d 49, (Tenn. Nov. 18, 2022), in which the court held that "Tennessee's mandatory sentence of life in prison[3] when imposed on a juvenile homicide offender with no consideration of the juvenile's age and attendant circumstances violates the Eighth Amendment's prohibition against cruel and unusual punishment." Id. at 66.[4] The court remedied the constitutional defect by applying

---

[3] A Tennessee petitioner sentenced to life receives a 60-year sentence but may be eligible for early release after serving "at least 51 years' imprisonment" by receiving sentencing credits. Atkins v. Crowell, 945 F.3d 476, 477 (6th Cir. 2019) (citing Brown v. Jordan, 563 S.W.3d 196, 200-02 (Tenn. 2018)). Thus, a sentence of "life" in Tennessee is a sentence of at least 51 years and no more than 60 years.

[4] As Judge Richardson recently observed,

Notably, in Booker, the court declined to find (or even reach the argument) that Tennessee's mandatory 51-to-60 year sentence for juveniles convicted of first-degree murder violated Miller's specific prohibition against mandatory sentences of life imprisonment without the possibility of parole for juveniles. See Miller, 567 U.S. at 479 (holding that "the Eighth Amendment forbids a

32

Tennessee Code Annotated § 40-35-501(h)(1), an unrepealed statute, to the affected juvenile offenders. Id. Absent other legislative action, the juvenile offenders will remain sentenced to sixty years but are "eligible for, although not guaranteed, supervised release on parole after serving between twenty-five and thirty-six years." Id. at *10.[5]

The Honorable Eli Richardson recently addressed Booker's application to a Miller claim raised in a federal habeas petition by Jamiel Williams, who was convicted of first-degree murder as a juvenile in 2006:

> Booker was clear that the remedy [was] "granting a parole hearing rather than resentencing[.]" Id. at *11. Booker makes clear that someone in Petitioner's situation—a then-juvenile convicted of first-degree murder—receive an individualized parole hearing in which his youth and other circumstances will be considered. As Booker indicates, this takes care of the very problem implicated via a Miller claim: the alleged unconstitutionality of the sentence imposed on petitioner, a mandatory prison sentence of between 51 and 60 years imposed on a juvenile. The remedy takes care of the problem because, given Booker's mandate of an individualized parole hearing for persons (including Petitioner) serving such sentences, the sentence is no longer mandatory.

Jamiel Williams v. Chance Leeds, No. 3:12-cv-00523, 2023 WL 336138, at *4 (M.D. Tenn. Jan. 19, 2023). Williams, like Booker and Polochak, had received a mandatory sentence of "life imprisonment," although the sentence of "life imprisonment" actually was, under Tennessee statute, a sixty-year sentence requiring at least fifty-one years of incarceration. Id. at 5 n.5; Booker, 656 S.W.3d 49, 53; Polochak, 2015 WL 226566, at *1. Judge Richardson found Williams's Miller

---

sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."). Indeed, in Booker, the court expressly declined to address whether a 51-to-60 year sentence is equivalent to [a sentence of] life without parole and is thus subject to Miller." 2022 WL 17072990, at *10. Instead, the Court held that such a sentence, when imposed on juveniles, violated the Eighth Amendment's requirement of proportionality in sentencing, irrespective of Miller's specific holding). Id. at 7.

Jamiel Williams v. Chance Leeds, No. 3:12-cv-00523, 2023 WL 336138, at *5 n.5 (M.D. Tenn. Jan. 19, 2023).

[5] The court acknowledged that its decision in Booker "directly affects Mr. Booker and over 100 other juvenile homicide offenders who are or will be incarcerated in Tennessee prisons under an unconstitutional sentencing scheme." 656 S.W.3d 49, 67. Thus, the Booker decision appears to be retroactive.

33

claim to be moot as a result of <u>Booker</u>'s holding because Williams will receive parole consideration under <u>Booker</u> after he serves at least twenty-five years' imprisonment. <u>Id.</u> at *5.

That is precisely the case here. Petitioner's <u>Miller</u> claim has been mooted by the holding in <u>Booker</u>.[6] As a juvenile offender at the time she committed first-degree murder, Petitioner will receive parole consideration under <u>Booker</u> after she serves between twenty-five and thirty-six years. Thus, she "will, at the appropriate time, receive an individualized parole hearing in which h[er] youth and other circumstances will be considered", as is required by <u>Miller</u> and <u>Montgomery</u>. <u>Booker</u>, 656 S.W.3d 49, 66. <u>See e.g.</u>, <u>Travathan v. Vannoy</u>, No. 18-7682, 2019 WL 11556747, at *4 (E.D. La. Jan. 4, 2019) (<u>Miller</u> violation remedied "simply by resentencing petitioner to a term of life imprisonment with the possibility of parole"), <u>report and recommendation adopted</u> 2020 WL 7728759 (E.D. La. Dec. 29, 2020); <u>Wolf v. Cassady</u>, No. 16-3334, 2019 WL 1089125, at *2 (W.D. Mo. Mar. 7, 2019) (due to a post-<u>Miller</u> statutory change, "Petitioner is no longer serving an unconstitutional sentence of life without parole. Petitioner is entitled to a parole hearing after he has served twenty-five years of his sentence."). Thus, Petitioner's Eighth Amendment claim will be dismissed as moot.

### 2. *Fifth Amendment Claim (Ground Four)*

In Ground Four of the petition, Petitioner alleges that the State obtained Petitioner's inculpatory statements in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). (Doc. No. 1 at 10; Doc. No. 2 at 36-37). According to Petitioner, she was "intoxicated during her interrogation" (Doc. No. 1 at 10) and/or "high" (Doc. No. 2 at 32); did not have a parent present for the questioning,

---

[6] As of August 14, 2023, the Tennessee Department of Correction Felony Offender Information website shows Polochak's release eligibility date as April 7, 2041. It is unclear whether that date has been adjusted to reflect <u>Booker</u>'s holding. <u>See</u> https://foil.app.tn.gov/foil/details.jsp (last August 14, 2023). The "Parole Hearing Date" field is blank. <u>See id.</u> In Respondent's most recent filing in this case, made post-<u>Booker</u>, Respondent does not address this issue. (<u>See</u> Doc. No. 24). As this Court is without confirmation that <u>Booker</u> has been applied to Petitioner, she should take steps to ensure that her release eligibility date has been adjusted accordingly.

even though she was a juvenile and even though Petitioner's mother had asked that Petitioner not be questioned until she (Petitioner's mother) arrived; and Petitioner did not understand her right to remain silent. (Doc. No. 1 at 10, Doc. No. 2 at 32). Thus, Petitioner asserts, her inculpatory statements not made "voluntarily, knowingly, and intelligently." (Doc. No. 2 at 36).

While Petitioner states that she did not exhaust this claim on direct appeal to the TCCA (Doc. No. 1 at 10),[7] Petitioner in fact argued on direct appeal that the trial court erred in denying her motion to suppress the evidence of inculpatory statements she made to emergency medical personnel and Indiana police officers. Polochak, 2015 WL 226566, at *21. After a detailed analysis, the TCCA considered and ultimately affirmed the trial court's denial of the motion to suppress. Id. at *21-28. Thus, Petitioner exhausted this claim, and AEDPA deference applies now in this habeas context.

The TCCA began its analysis of Petitioner's claim by setting forth the circumstances in which Petitioner gave the challenged statements:

> The statements in question were made on December 12, 2010. The proof at the suppression hearing showed that around 8:05 a.m., Tennessee authorities requested ISP Sergeant Matthew Collins's assistance in investigating a car theft and two persons of interest in a Tennessee homicide. A Gas City Indiana police officer found the stolen car at the Defendant's grandparents' house around 11:13 a.m. The Defendant and Mr. Bowers were inside the house and were transported to the Gas City Police Department around 11:23 a.m. At the police station, paramedic Rebecca Kinder evaluated the Defendant, and paramedics Yolande Bailey and Justin Black evaluated Mr. Bowers. The evaluation was due to a report that the Defendant and Mr. Bowers had attempted suicide. The Defendant made incriminating statements to Ms. Kinder, which were overheard by Ms. Bailey. The Defendant, who was sixteen years old, was later taken to a juvenile detention facility. Sergeant Collins and Deputy Chad Hammel arrived at the juvenile facility about 6:50 p.m., and they began interviewing the Defendant at 7:05 p.m. After being advised of her Miranda rights, the Defendant signed a written waiver at 7:17 p.m. and inculpated herself and Mr. Bowers in a recorded statement.

---

[7] Petitioner alleges in her petition that counsel "failed at bringing this issue up" and that counsel's "negligent behavior should not bar Petitioner" from raising the claim now. (Doc. No. 1 at 10).

35

Sergeant Collins testified at the suppression hearing that he was first contacted about the case by Overton County Sheriff's Deputy John Mackie, who requested his help finding the Defendant and Mr. Bowers. He did not recall their discussing whether he would question the Defendant, if located. The victim's car was found at the Defendant's grandparents' house, and the suspects were found inside the house and taken to the police station. The grandparents were interviewed, and the car was impounded.

Sergeant Collins testified that when he arrived at the police station, an ambulance was outside the building. He took statements from Ms. Bailey and Ms. Kinder. He said the Defendant appeared fine physically. He did not recall her clothes being wet.

Sergeant Collins testified that because the Defendant was a juvenile and her mother was in Tennessee, he talked to the district attorney's office in Tennessee about interviewing her. He faxed a copy of the ISP Advice of Rights and Waiver form to the district attorney in Tennessee. It was his understanding that Tennessee authorities explained the situation and the form to the Defendant's mother and obtained her permission for the Indiana authorities to interview the Defendant. He received the form, signed by the Defendant's mother, by fax. He said he talked to other Tennessee law enforcement personnel. He did not recall anyone telling him that the Defendant's mother did not want the Defendant interviewed or that the Defendant's mother initially refused permission before later signing the waiver form.

Regarding the statement Sergeant Collins and Deputy Hammel took from the Defendant at the juvenile detention facility, Sergeant Collins testified that he advised the Defendant of her rights. He told the Defendant that her mother had signed a waiver for her to speak with Indiana authorities and showed her the form. She signed the waiver. The form the Defendant signed was received as an exhibit and stated in part, "If you are a juvenile, you have the right to talk with your parent or guardian before any questioning and to have them with you during such questioning."

Sergeant Collins testified consistently with his trial testimony regarding the substance of the Defendant's statement. A recording of the interview was received as an exhibit. He stated that the Defendant related the events in narrative form and that he only asked a few questions to elicit details. He said Deputy Hammel asked some questions. He said the Defendant was upset and cried at times, although he did not see many tears. He said that her communication was coherent and that she did not appear intoxicated, injured, or in ill health, only emotional. He said he never promised leniency. She did not ask to have a parent present for the statement. He said that in hindsight, they could have taken the Defendant's statement the following day.

Rebecca Kinder, who was a volunteer paramedic on December 12, 2010, testified that she, Yolande Bailey, and Justin Black responded to the police station regarding a possible overdose. She did not speak with any officers about the reason the Defendant was there. She assessed the Defendant. Ms. Bailey and Mr. Black assessed Mr. Bowers, who was in another room. She said officers asked the Defendant for her mother's name and contact information, which the Defendant initially refused. The Defendant stated her mother did not care and was "nothing but a drunk." She said that she had been staying with her boyfriend's grandmother, that her mother wanted her to come home to prevent her mother from losing food stamp benefits, and that her mother threatened to have Mr. Bowers prosecuted for statutory rape if the Defendant did not come home. The Defendant stated that she and Mr. Bowers injected nicotine water. When Ms. Kinder asked why the Defendant was "soaking wet," the Defendant stated she and Mr. Bowers tried to kill themselves in a bathtub with appliances because they wanted to be together forever. The Defendant said she was sorry she had hurt a woman in Tennessee and wished she had not. The Defendant said she and her boyfriend killed the victim when he choked the victim with a dog cord and she put a pillow on the victim's face. Ms. Kinder said she did not say anything to elicit the Defendant's statements. She said Ms. Bailey came into the room during the Defendant's admissions and heard part of it. Ms. Kinder said she was surprised by the Defendant's admissions and left the room.

Ms. Kinder said the Defendant's vital signs were normal. She said the Defendant cried and appeared upset. The Defendant reported that she felt slightly nauseous, which Ms. Kinder thought might be from the nicotine water. The Defendant thought she might be pregnant. Ms. Kinder said the Defendant was not handcuffed and did not recall if the Defendant was shackled. She said it never crossed her mind that the Defendant was in custody. She said she was there to assess a patient who had attempted suicide.

Yolande Bailey testified that she went to the Gas City Police Department on December 12, 2010, regarding a possible suicide attempt. An officer told her that the Defendant and Mr. Bowers were there for questioning about a Tennessee homicide. She did not think she told Ms. Kinder this information. She and Mr. Black assessed Mr. Bowers while Ms. Kinder assessed the Defendant. Mr. Bowers refused treatment, and Ms. Bailey went into the room where Ms. Kinder was assessing the Defendant to complete her paperwork. She heard Ms. Kinder ask the Defendant about who had been hurt, referring to the victim, and how the authorities could help the person. She did not think about the propriety of the questioning and continued doing paperwork. She said, though, she was concerned when she heard the Defendant say they killed the victim. Ms. Kinder went to find an officer. She said an officer "quickly went into there and advised for it to stop." She said the Defendant' clothes appeared to be "soaking wet," and she thought Mr. Bowers's clothes were wet. She said the Defendant may have had a blanket.

Kimberly Coffel, the Defendant's mother, testified for the defense. She said that before December 12, 2010, the Defendant had been living away from home for a month with "Ben," whose last name she did not know. She thought they lived next door to the crime scene. She said she had been by the home but had not visited it to check on her daughter in the month before the crime. She said she and the Defendant "were having some problems." She thought that she would give the Defendant one month away from home to live as an adult and that the Defendant would decide to return home. She said that although she and the Defendant were "essentially estranged" and did not speak daily, she talked to the Defendant's school counselor daily.

Ms. Coffel testified that she talked to her daughter on the Friday before Sunday, December 12, 2010. She said she told the Defendant that she had called Child Protective Services for assistance in getting the Defendant home. She acknowledged saying she could have Mr. Bowers jailed but did not think she said she could have him prosecuted for statutory rape. She said she talked to the Defendant about a letter she received notifying her that her food stamp benefits would decrease because the Defendant was not living with her. She said, though, she did not care about the benefits and wanted the Defendant home. She said the call did not end well.

Ms. Coffel testified that on December 12, 2010, at 9:00 a.m., Sheriff Melton, Assistant District Attorney General Gore, and District Attorney General's Investigator Kendall Hargis came to her house and asked about the Defendant and her possible whereabouts. She said that despite her repeated inquiries, they would not tell her anything except that it was serious. After they left, Ms. Coffel spoke with her mother by telephone and learned the Defendant was at Ms. Coffel's mother's house. She called Mr. Hargis and advised him of the Defendant's location. Sheriff Melton called her around 10:00 or 10:30 a.m. and said the Defendant had been detained. She said she called the Gas City Police Department before 11:00 a.m. and told Officer Keith Emmons that she did not want the Defendant questioned without an attorney present. He told her the Defendant was being taken to juvenile detention. She called the juvenile detention facility and advised Officer Tetter that the Defendant was being transported to the facility and that the Defendant should not be questioned until an attorney or Ms. Coffel was present. She said she told Mr. Hargis the same thing.

Ms. Coffel testified that around 11:00 a.m., Mr. Gore, an unidentified officer, and District Attorney General York came to her house with a document they wanted her to sign allowing the Defendant to be questioned. She said they would not tell her what was going on other than that it was serious. She said she declined to sign the document, and Mr. York told her that the matter was serious and that if she did not sign it, he would prosecute the Defendant to the fullest extent of the law. She said that Mr. York told her that the Defendant would probably spend the rest of her life in prison, that it would be best for everyone if she signed the document, and that if she signed it, the Defendant would likely get out of prison someday. She said

38

she felt pressured and intimidated and was "blatant" in saying "no, no." She said Mr. Gore told her it would be better for everyone if she signed the document. She said her boyfriend was nervous and told her maybe she should sign. She said that although she told herself the Defendant should not be questioned without an attorney present, she ultimately signed the document after making telephone calls. She said she did not "really read" the document and trusted what the State's representatives told her. She did not think anyone else came to her house that day.

Ms. Coffel testified that she did not recall the State's representatives telling her that the Defendant was a suspect in a murder but acknowledged they said there had been a homicide. She said the sheriff had advised her earlier that there had been a homicide but did not identify the victim. She said she wanted to talk to the Defendant, but no one told her that she could. She said no one told her that she had the right to visit the Defendant daily unless prohibited by court order or that the Defendant had a right to a detention hearing. She claimed she did not remember their saying they did not know whether the Defendant would be charged because they did not know the facts, but she later admitted that this had been said. She said that although the waiver document listed times of 2:15 p.m. and 2:25 p.m., the times were not on the document when she signed it. She said she could not have gone to Indiana that day because there had been a snow storm.

Investigator Kendall Hargis testified that he, Sheriff Melton, and Mr. Gore went to Ms. Coffel's house around 8:30 a.m. on December 12, 2010, in order to determine the Defendant's whereabouts. He was certain Ms. Coffel wanted to know why they wanted to locate the Defendant. He thought they told her that it was urgent but not that it was related to a homicide. He said they relayed the information they obtained from Ms. Coffel to Indiana authorities.

Investigator Hargis testified that Agent Huntley requested he contact Ms. Coffel to obtain permission to interview the Defendant. He was unaware Ms. Coffel told other officers she did not want the Defendant interviewed. He called Ms. Coffel, who advised him that she had already spoken with Officer Emmons in Indiana and that she did not want the Defendant questioned without an attorney. He relayed the information to Agent Huntley but did not know if he told anyone else. He said it was "likely" he told Agent Huntley that Ms. Coffel had told other officers she did not want the Defendant questioned. He did not think he told anyone other than Agent Huntley about his conversation with Ms. Coffel, but he acknowledged it was possible he had. An audio recording of the telephone call was played.

Gregory Hutte testified that he lived with Ms. Coffel and was home on December 12, 2010. He said he was aware of the problems between Ms. Coffel and the Defendant. He said Ms. Coffel had been trying to visit the Defendant. He said that when Mr. Hargis, Mr. Gore, and Sheriff Melton visited on the morning of December 12, they would not answer his and Ms. Coffel's questions about why they were looking for the Defendant. He said that after they left, Ms. Coffel made telephone calls to the ISP, the Gas City Police, and "some other places" trying to

39

obtain information about the Defendant. He said that based upon what he heard Ms. Coffel tell Gas City authorities, he was "shocked" the Defendant was questioned. Mr. Hutte testified that when the State authorities brought the waiver for Ms. Coffel to sign permitting questioning of the Defendant, Ms. Coffel told them that she did not want the Defendant questioned without a lawyer or herself present. He said Mr. York advised them that if she did not sign the document, he would prosecute the Defendant to the fullest extent of the law and that the Defendant probably would never be released from prison. Mr. Hutte said that Mr. York stated the Defendant might someday be released if Ms. Coffel signed the document. He said that Ms. Coffel "went back and forth" and that he told her maybe she should sign it. He said he was scared. He said that she eventually signed it and that she looked scared. Regarding the time the authorities were at the house, he thought it was later than 10:00 or 11:00 a.m. and said he "suppose[d]" the time of 2:00 or 2:15 p.m. shown on the document was accurate. He said Mr. York stated during the visit with him that the crime scene was the worst he had ever seen but was unsure if Mr. York said he was not yet aware of all the facts.

Mr. Hutte disagreed that the sheriff told them before the second visit from the authorities that a homicide had occurred. He later said he did not remember if the sheriff called and said a homicide had occurred and did not remember if Ms. Coffel said the sheriff had called and mentioned a homicide. He said he drove past the victim's house and saw crime scene tape. He said he told Ms. Coffel it looked "pretty bad."

After receiving the proof, the trial court made the following pertinent findings: The Defendant was in custody when the paramedics were present. She was questioned by Ms. Kinder for the purpose of rendering medical aid to a minor. Ms. Kinder was not an agent of the State when she asked the Defendant questions pertinent to rendering medical aid. Ms. Kinder had no prior knowledge of the case. Ms. Bailey overheard the Defendant's statements about the crime and was not a state agent. As soon as the paramedics understood that the Defendant was incriminating herself, they stopped her. The police officers present took appropriate action to ensure the Defendant was not questioned until she was advised of her rights. The Defendant was given a thorough Miranda warning before she signed the waiver and gave her recorded statement. When she said she had been "doing this all day," she was referring to giving her identifying information. The recording shows that Sergeant Collins did not overbear the Defendant's will. She was given the opportunity to state what she knew, and she wanted to do so. She said she was going to be truthful. She was able to explain the meaning of "coercion." The court concluded upon review of the totality of the circumstances, the State had proven by a preponderance of the evidence that the statement was voluntary. The court filed a written order that stated the Defendant's statement to the paramedics was admissible in its entirety, and the statement to the police officers before she asked for a lawyer was admissible.

Polochak, 2015 WL 226566, at *21-25.

The TCCA addressed Petitioner's claim in two parts: (1) the voluntariness of her statement to paramedics while they were evaluating her for a possible suicide attempt and (2) the voluntariness of her statement to the police, which Petitioner gave after signing a written waiver of her Miranda rights. With regard to the former, the TCCA agreed with the lower court that the paramedics to whom Petitioner confessed were not state actors and that Petitioner's statements to the paramedics were not a result of custodial interrogation by the police. Id. at *26. The TCCA reached this decision after determining that "[n]o evidence shows that the police recruited the paramedics to obtain information from [Petitioner]"; rather, the TCCA found, the evidence showed that the paramedics were responding to Petitioner's possible suicide attempt and had not spoken with any officers about the reason Petitioner was at the police station. Id. at *25. The TCCA further found that "[n]o evidence shows any attempt by the paramedics to elicit incriminating information." Id. Instead, the paramedics "were focused on getting help for the victim before Ms. Kinder understood the victim was deceased." Id. The paramedics ended their encounter with Petitioner once she began incriminating herself. Id.

With regard to the voluntariness of Petitioner's statements to the police, the TCCA applied the test of voluntariness for confessions under Article 1, § 9 of the Tennessee Constitution because it is "broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." Id. at *26.[8] Because Petitioner was a juvenile at the time she made the statements to police, the TCCA analyzed Petitioner's waiver of her Miranda rights using a totality of the circumstances test that takes into account the following factors:

> 1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;

---

[8] Even so, the TCCA also cited and applied clearly established federal law, Colorado v. Connelly, 479 U.S. 157, 163-64 (1986), in its analysis of the voluntariness of Petitioner's statements to the police. Id.

(2) the juvenile's capacity to understand the <u>Miranda</u> warnings and the consequences of the waiver;

(3) the juvenile's familiarity with <u>Miranda</u> warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

<u>Polochak</u>, 2015 WL 226566, at *27 (quoting <u>State v. Callahan</u>, 979 S.W.2d 577, 583 (Tenn. 1998)).[9] Additionally, the TCCA considered the Tennessee Rules of Juvenile Procedure as they relate to the questioning of children suspected of committing crimes. <u>Id.</u> (citing Tenn. R. Juv. P. 7(d)). Applying the <u>Callahan</u> factors and considering Rule 7 of the Tennessee Rules of Juvenile Procedure, the TCCA agreed with the lower court that Petitioner had voluntarily confessed to Sergeant Collins and Deputy Hammel. <u>Id.</u> at *26-28.

Regarding Petitioner's capacity to understand the <u>Miranda</u> warnings and the consequences of the waiver as well as Petitioner' familiarity with *Miranda* warnings, the TCCA found that Petitioner had been "thoroughly advised" of her <u>Miranda</u> rights and had voluntarily and intelligently waived those rights by signing a waiver form. <u>Id.</u> at *27. The TCCA noted that Petitioner was sixteen during the interrogation and "was intelligent and had life experience" because she was "living independently from her mother" with Bowers. <u>Id.</u> at *27. Petitioner was able to define "coercion" and "appeared to understand her rights when they were explained to her."

---

[9] <u>See</u> <u>Elliot v. Genovese</u>, No. 3:17-cv-0250, 2017 WL 5884884, at *10 (M.D. Tenn. Nov. 29, 2017) (citing <u>State v. Rushing</u>, No. M2003-00101-CCA-R3CD, 2004 WL 784869, at *8 (Tenn. Crim. App. Apr. 12, 2004) (citing cases)) ("In any event, the TCCA has long held that even the admissibility of a juvenile's confession is not dependent upon the presence of his or her parents or an attorney at the interrogation."). As this Court noted in <u>Elliot</u>, the presence of a parent is but one consideration that the state court will consider when determining the admissibility of a juvenile's confession. <u>Id.</u> (quoting <u>State v. Carroll</u>, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999) (citing <u>State v. Callahan</u>, 979 S.W.2d 577, 583 (Tenn. 1998)) ("[N]o single factor [including the presence of an interested adult] . . . should by itself render a confession unconstitutional absent coercive police activity.").

Id. She needed little prompting from authorities when confessing, "readily provid[ing] information in narrative form[.]" Id. She stated that she was going to be truthful. Id. Petitioner appeared to "want[] to relate the facts to the authorities." Id.

Moving to the effects of Petitioner's possible intoxication and prior suicidal attempts, the TCCA acknowledged Petitioner's drug use and suicide attempts but noted that Petitioner had been in custody for eight hours before giving her statement. Id. Although Petitioner insists now that she "intoxicated" at the time she gave her statement (see Doc. No. 2 at 11), the TCCA found that the evidence showed Petitioner had communicated "without apparent impairment" (id.) and "did not appear to be in acute distress." Id. at *28. Kinder testified that, earlier that day, she had found Petitioner to have normal vital signs and no need of medical treatment. Id. The recording of Petitioner's statement shows that Petitioner was upset and cried frequently during the interview with police, but "she was not so overcome with emotion that she had any difficulty relating the events of the crimes." Id. Instead, "[s]he expressed her desire to tell the truth about the crime and her remorse for its effects on the lives of herself, Mr. Bowers, and her unborn child." Id. Thus, it appears that Petitioner knowingly and voluntarily elected to talk to police.

Addressing Petitioner's parental consent argument, the TCCA noted that, although Petitioner's mother initially denied investigators consent to interview Petitioner without a parent present, Petitioner's mother later "changed her mind after she received more information . . . that a homicide had occurred, talked to the district attorney general . . . , and made telephone calls." Id. While acknowledging Petitioner's assertion that her mother was threatened with Petitioner receiving harsher punishment if her mother did not sign the consent form, the TCCA found that "the evidence falls short of showing that Ms. Coffel was threatened or coerced into signing the form." Id. The TCCA noted that Petitioner had told Kinder that she (Petitioner) did not want to

provide her mother's contact information "because her mother did not care about her and was a drunk." Id.

The Fifth Amendment privilege against self-incrimination protects the accused from being compelled to incriminate herself. U.S. Const. amend. V, XIV; Miranda, 384 U.S. at 467. The State may not use statements made by the accused during custodial interrogation unless the State can demonstrate that the police adequately and effectively apprised the accused of her rights and that the accused's exercise of her rights was fully honored. Id. The police must warn the accused that she has the right to counsel during interrogation; if the accused requests counsel, the interrogation must stop until counsel is provided. Id. at 472-74.

The accused may knowingly and voluntarily waive her Miranda rights. A waiver is "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 (1938). Courts should examine the totality of the circumstances surrounding the waiver to determine whether it was knowingly and voluntarily made. Id. A valid waiver of rights is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010). To determine whether the accused knowingly waived her Miranda rights, courts examine whether the accused waived her rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).

Here, the record reflects that the trial court considered the relevant factors and concluded upon a review of the totality of the circumstances that the State had proven by a preponderance of the evidence that Petitioner's statements to the paramedics and police were voluntary. The record further reflects that it was not unreasonable for the TCCA to conclude that the evidence did not preponderate against the trial court's findings. Although the TCCA analyzed part of the claim

under the broader protection afforded by the Tennessee Constitution, the analysis did not contradict Miranda and, in any event, the TCCA also cited to relevant federal law in its analysis of that part of the claim. And while Petitioner's mother's absence is of some concern, the evidence relative to the entire situation supports the trial court's denial of the motion to suppress the statement and the TCCA's affirmation of that decision.

Petitioner, who bears the burden here, fails to explain why the TCCA's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner instead argues that her attorney failed to raise this issue previously, which the Court already has determined is inaccurate. Petitioner does not provide any evidence to contract the state courts' findings, which are supported by the record. The state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, see 28 U.S.C. § 2254(e)(1), which Petitioner has not submitted. Consequently, the Court finds that Petitioner has not shown that she is entitled to relief on this claim because the TCCA's determination was not contrary to law. Neither was the TCCA's determination based on an unreasonable applicable of the law. This claim is without merit and will be dismissed.

B. Procedurally Defaulted Claims

Petitioner procedurally defaulted two claims: Ground Two (ineffective assistance of counsel) and Ground Three (Sixth Amendment confrontation clause claim). Petitioner does not attempt to demonstrate cause and prejudice excusing the defaults. Neither does Petitioner assert that a fundamental miscarriage of justice will occur if the Court does not excuse these default and review these claims on the merits. These claims are therefore barred from review in this court.

45

1. *Ineffective Assistance of Counsel Claims (Ground Two)*

Petitioner asserts seven claims of ineffective assistance of counsel in Ground Two. Petitioner alleges that trial counsel provided ineffective assistance when he failed to move to suppress Petitioner's statement; failed to call an expert to testify about Petitioner's state-of-mind due to the abuse she suffered from Bowers; failed to request a change of venue; failed to request DNA testing on the pillowcase used to murder Breeding; failed to request Jencks material about the State's witnesses; failed to object to alleged prosecutorial misconduct; and failed to provide a defense based on Petitioner's age and victimization by her co-defendant. (Doc. No. 1 at 7-8; Doc. No. 2 at 32-35).

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. See Bell v. Cone, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 686-87 (1984); Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000), cert. denied, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. Bigelow v. Williams, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

46

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

A court hearing an ineffective-assistance-of-counsel claim must consider the totality of the evidence. Strickland, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" West v. Seabold, 73 F.3d 81, 84 (6th Cir. 1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision: "was contrary to" federal law as clearly established at the time in the holding(s) of the United States Supreme Court, § 2254(d)(1); "involved an unreasonable application of" such law; or "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, where (as here) a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington v. Richter, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in Harrington:

> This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under

47

AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

562 U.S. at 101 (internal quotation marks and citation omitted). In other words, Strickland mandates deference to counsel's decisions, and the AEDPA mandates deference to state courts, so "[h]abeas claims based on ineffective assistance of counsel are evaluated under a "doubly deferential" standard. Abby v. Howe, 742 F.3d 221, 226 (6th Cir. 2014) (citing Burt v. Titlow, 571 U.S. 12, 15 (2013)).

Here, all of Petitioner's claims of ineffective of assistance of counsel pertain to trial counsel. And all seven claims are procedurally defaulted.

In her pro se petition for post-conviction relief, Petitioner alleged that she was deprived of the effective assistance of counsel during pretrial proceedings, trial, and post-trial proceedings and on direct appeal. (See Doc. No. 20-31 at 8-9). Appointed counsel filed an amended petition for post-conviction relief alleging that defense counsel Savage was ineffective in twelve ways (id. at 39-41) and a second amended petition for post-conviction relief adding two additional ways in which defense counsel was ineffective (id. at 48-50). However, at the post-conviction evidentiary hearing, Petitioner's counsel stated that she did not intend to pursue certain claims. (Doc. No. 20-32 at 2660, 2662). Instead, post-conviction counsel focused her efforts on claims that trial counsel did not allow Petitioner to testify at the suppression hearing, failed to procure the testimony of an expert in abusive relationships, failed to request DNA analysis of certain evidence, did not object to the State's violating evidence rule 615, failed to offer evidence of Petitioner's intoxication during her interrogation, should have requested an independent autopsy, and should have prevented Bowers's statement from being read to the jury. (Id. at 2660-62). The post-conviction

48

court denied relief. On appeal of the denial of post-conviction relief, Petitioner raised only one issue: whether Petitioner's Sixth Amendment rights were violated by the admission of Bowers's statement. (Doc. No. 20-35 at 2771). In its opinion, the TCCA accordingly confined its recitation of the evidence offered at the hearing to that issue and only addressed that one issue. Polochak, 201 at *4.

Because Petitioner did not present her other ineffective-assistance claims to the TCCA on post-conviction appeal, the first court of competent jurisdiction, she procedurally defaulted those claims. 28 U.S.C. § 2254(c); Coleman, 501 U.S. at 732. She therefore has waived those claims (every ineffective assistance claim raised in her second amended post-conviction petition except for the claim concerning the admission of Bowers's statement, which the Court addresses below) for purposes of federal habeas corpus review. The Court can only review those defaulted claims if Petitioner establishes cause for the default and actual prejudice or that the Court's failure to address these claims would result in a fundamental miscarriage of justice.

Petitioner does not acknowledge her default of these claims. She does not attempt to establish cause or prejudice to excuse the defaults. Neither does she argue that a fundamental miscarriage of justice would occur if the Court does not excuse the defaults and address the claims on the merits. These claims are therefore barred from review in this court.

### 2. *Sixth Amendment Claim (Ground Three)*

In Ground Three of the petition, Petitioner alleges that the trial court violated her right to confrontation under the Sixth Amendment. (Doc. No. 1 at 8; Doc. No. 2 at 35). Specifically, Petitioner alleges that the trial court unlawfully allowed the introduction of Bowers's police statement as evidence without allowing Petitioner to cross-examine Bowers, "making it impossible for [the jury] to hear the entire story or the truth of the matter." (Doc. No. 2 at 35).

In her post-conviction petition, Petitioner raised a number of ineffective assistance of counsel claims. One such claim was "that written statements by Mr. Bowers should not have been read as evidence as it violated her Sixth Amendment right to cross-examination." Polochak, 2019 WL 5692112, at *4. The post-conviction court denied relief, finding that trial counsel "did not object to the use of [Bowers's] statement to law enforcement during trial. It was a defense strategy to shift blame to [Bowers] and the use of [his] statement served that purpose." Id.

Petitioner appealed the denial of this claim to the TCCA, couching it as a Sixth Amendment confrontation claim rather than an ineffective assistance of counsel claim. Id. Citing Tennessee Code Annotated § 40-30-106(g),[10] the TCCA found that, because Petitioner had not challenged the admission of Bowers's statement on Sixth Amendment grounds either at trial, on direct appeal, or to the post-conviction court, she had waived the claim. Id. at *5. The Sixth Circuit has held that this statutory rule constitutes an adequate and independent state procedural ground for denying relief based upon procedural default. See Coe v. Bell, 161 F.3d 320, 329-330 (6th Cir. 1998) (holding that court was unable to reach merits of Coe's malice-jury-instructions claim because claim was procedurally barred due to Coe having waived claim by failing to raise it at trial, on direct appeal, or in his first state post-conviction motion); Hollis v. Perry, No. 3:17-cv-626, 2018 WL 6181354, at *30 (M.D. Tenn. Nov. 27, 2019) (citing Coe and discussing the waiver rule).

Additionally, the TCCA found that Petitioner's appellate brief did not satisfy the requirements of Tennessee Rule of Appellate Procedure 27 or of Rule 10 of the Rules of the TCCA, which also resulted in a waiver of the claim on appeal. Id. The TCCA therefore affirmed the judgment of the post-conviction court. Id.

---

[10] Tennessee Code Annotated § 40-30-106(g) provides that "a ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"

The Court can review this defaulted claim only if Petitioner "can [either] demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[] or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Monzo*, 281 F.3d 568, 575 (citing <u>Coleman</u> *v*, 501 U.S. 722, 750). Petitioner cannot make this showing for two reasons.

First, Petitioner does not offer cause or prejudice to excuse her default. (<u>See</u> Doc. No. at 8; Doc. No. 2 at 35). She does not acknowledge the default of this claim.

Second, the record shows that, as a defense strategy, trial counsel waived objection of this issue at trial. At Petitioner's post-conviction hearing, trial counsel testified that he had "multiple reasons" for allowing Bowers's statement into evidence, namely to support the defense theory of shifting blame to Bowers. (Doc. No. 20-32 at 2707- 08). Counsel explained that, "[t]he more [the defense could] show [Bowers] was responsible, the better it was for our case." (<u>Id.</u> at 2675.) Trial counsel assumed, "without now remembering what the statement said, that [Bowers] admitted to the crime. If he did inculpate [Petitioner,] [counsel thought] one thing we tried to bring up was that [Bowers] wanted to take her down with him and he would have every reason to do that." (<u>Id.</u> at 2706). After reviewing the statement's contents, trial counsel testified that the statement supported the defense theory because it demonstrated Bowers's "violent" nature and the influence he exerted over Petitioner. (<u>Id.</u> at 2707-08). In particular, "Bowers and [Petitioner] had gone over what to say when he was threatening to kill her and those kinds of things. So what, what she said he told her to say was in the statement as to what happened." (<u>Id.</u> at 2708.)

"Waiver is an 'intentional relinquishment of a known right.'" <u>United States v. Olano</u>, 507 U.S. 725, 733 (1993) (quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938)). "A criminal defendant who has waived her rights 'may not then seek appellate review of a claimed deprivation of those

rights, for [her] waiver has extinguished any error.'" Moore v. Burt, No. 2:15-cv-10452, 2017 WL 2812821, at *5 (E.D. Mich. June 29, 2017) (quoting United States v. Griffin, 84 F.3d 912, 924 (7th Cir. 1996) (citing Olano, 507 U.S. at 733-34)). The right to confrontation may be waived by failing to object to the "offending evidence." Melendez-Diaz v. Massachusetts, 557 U.S. 305, 314 n.3 (2009). In Moore, defense counsel had stipulated to the admission of evidence that the petitioner later challenged by way of a Confrontation Clause claim, just as Petitioner did and is doing now. 2017 WL 2812821, at *5. The court found that defense counsel had waived review of the claim, pointing out that "a defendant in a criminal case cannot complain of error which he himself has invited." Id. (citing Shields v. United States, 273 U.S. 583, 586 (1927)). Thus, "[w]hen a petitioner invites an error in the trial court, [s]he is precluded from seeking habeas corpus relief for that error." Id. (citing Fields v. Bagley, 275 F.3d 478, 486 (6th Cir. 2001)). Like Moore, Petitioner here cannot use Bowers's statement to support her defense then later claim constitutional error. See id.; see also United States v. Chun Ya Cheung, 350 F. App'x 19, 21-22 (6th Cir. 2009) (holding that defendant waived Confrontation Clause challenge by consenting to admission of at-issue evidence).

Thus, for that reason, and because this claim is procedurally defaulted without sufficient cause and prejudice to excuse the default, and because Petitioner has not asserted that a fundamental miscarriage of justice would occur if the Court does not excuse the defaults and address the claims on the merits, this claim must be dismissed. This claim is barred from review in this court.

C. Summary

In summary, Petitioner's Eighth Amendment claim is moot, and her Fifth Amendment claim lacks merit. Her other claims are procedurally defaulted without sufficient cause, and

Petitioner has not shown that failure to consider those claims on the merits will result in a fundamental miscarriage of justice.

## V.  CONCLUSION

For the reasons set forth herein, the petition seeking relief under 28 U.S.C. § 2254 will be denied, and this action will be dismissed with prejudice.

In so ruling, the Court notes that it does not write on a clear slate in adjudicating the petition. The Court does not resolve the petition by deciding, for example, whether Petitioner was in fact guilty (and if so, of what), whether Petitioner should have been convicted by the jury (and if so, of what), or even whether it personally believes in the first instance that Petitioner's claims are meritorious. Instead, as discussed herein in detail, the Court applies established principles to determine the extent to which it can review Petitioner's claims at all, and, for those claims that it determines it can review, it applies the demanding standards of AEDPA.

## VII.  CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the Court will deny a COA. However, Petitioner may seek a COA from the Sixth Circuit.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE